THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICARDO MALDONADO, Defendant-Appellant.

First District (1st Division)   No. 1—90—1605

Opinion filed May 17, 1993.

Rita A. Fry, Public Defender, of Chicago (Elyse Krug Miller, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Montel M. Gayles, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Following a bench trial, defendant Ricardo Maldonado was convicted of intimidation (Ill. Rev. Stat. 1989, ch. 38, par. 12—6(a)) and sentenced to two years' imprisonment. The sole issue on appeal is whether he was proven guilty beyond a reasonable doubt. We affirm.

The returned indictment against defendant charged as follows:

"[O]n or about March 27, 1989 at and within the County of Cook

RICARDO MALDONADO
MARIO PALOMINO

committed the offense of

INTIMIDATION

in that THEY, WITH THE INTENT TO CAUSE SHERRY CRUZ TO OMIT THE PERFORMANCE OF AN ACT, TO WIT: CALLING POLICE TO REPORT THEIR ACTIVITIES, DID COMMUNICATE TO SHERRY CRUZ A THREAT WITHOUT LAWFUL AUTHORITY [TO] INFLICT PHYSICAL HARM TO HER IN VIOLATION OF CHAPTER 38, SECTION 12—6—A(1) ***."

Defendant was tried with codefendants Mario Palomino and Anthony Frigo.

Sherry Cruz, 26 years old, testified that she lived in a row house in the projects with her three children, ages four through seven. On March 27, 1989, at 9:30 p.m., she was watching television while her children were upstairs sleeping. She heard a lot of noise on her back porch and went to the back door. She opened the back door and saw a group of about 15 people including the defendant, Frigo and Palomino, whom she identified in court. Defendant and Frigo were right up against the screen door and Palomino was to the side. Cruz asked the group if they would move because her children were sleeping. None of the defendants said anything, and Cruz went inside her house.

At 10:15 p.m. the same evening, the group was still making noise, so Cruz went to the back door a second time. She again asked them to move because her children were trying to sleep. No one said anything to Cruz.

Cruz then testified as follows:

"Q. [Assistant State's Attorney] Did anything unusual happen that evening?

A. Yes.

Q. What happened?

A. At 11:15 I was watching TV and I heard this big bang, like bang glass, big noise.

Q. I'm sorry. Go ahead.

A. So I went to the door again. I open up the front door. I didn't open the screen door, just the inner part of the door.

Q. This would be your rear door, correct?

A. Yes, the back door.

Q. Did you look outside?

A. Yes, I did.

Q. What did you see when you looked outside?

A. I seen [*sic*] Mr. Palomino, Mr. Frigo, and Mr. Maldonado.

\* \* \*

Q. Okay, in addition to these three defendants, did you see anyone else out there at that time?

A. Yes, I did.

Q. And who was that?

A. Same group, about 15 people were still there.

Q. When you went to the door, did you say[ ] anything to these boys at that time?

A. Yes, I did.

Q. What did you say to them?

A. I told them I didn't ask them not once, twice, but three times if they can please move off my porch because my kids [were] trying to sleep. And since they didn't want to leave, they leave me no other choice but to call the police.

Q. And after you told them that you were going to call the police, did any of them say anything to you?

A. Yes, they did.

Q. Who is the first one to say something to you?

A. Mr. Frigo.

Q. What did Mr. Frigo say to you at that time?

A. He told me that if I was to call the police, he was going to put a bullet through my head and he was going to bomb my house. He would take care of my kids.

Q. Where was he when he said that to you?

A. He was facing all the way to the screen.

Q. Where were your children at that time?

A. Right behind me.

Q. While Mr. Frigo was saying that, what was Mr. Maldonado doing there?

A. He was staying there representing, saying shut the F-up, get in the F-ing house. Why don't you stay there, mind your own business. This is Disciple Nation turf. Shut up. At that point I closed the door.

Q. While Mr. Maldonado was saying that, did Mr. Palomino say anything?

A. He was yelling. He was saying Disciple love, shut up, go in the house. The rest of them were throwing objects at that time. I didn't know what it was until later.

\* \* \*

Q. Now after that, what did you do?

A. I went in the house and I dialed 911.

\* \* \*

Q. After you heard this, these noises by the back door, what did you do?

A. I went back to the door.

Q. Okay. And what did you do when you went back to the door?

A. I told them that the police was [sic] coming.

Q. Did you open the back door?

A. Yes, I did.

Q. Who was there when you opened the back door?

A. The same people.

Q. Okay. And what did you say to them at that time, if anything?

A. I told them that I called the police and that they were going to be coming. That they were on their way.

Q. Did either of these three defendants say anything to you at that time?

A. Yes.

Q. Which one said something first?

A. Mr. Maldonado.

Q. What did he say to you at that time?

A. He said didn't you hear what Peter said. Whjich [sic] is Anthony. He said if you call the police, I am going to put a bullet right the [sic] through the middle of your head. He explained to me how he was going to make a cocktail bomb. He was gone go to [sic] put gasoline in a bottle, put a rag on it, light it and throw it in my house. And if that didn't take care of my kids, he then would take care of my kids.

\* \* \*

Q. Did Mr. Palomino say anything to you?

A. Yes, he did.

Q. What did he say to you?

A. He said Disciple Nation, MAG killers.

Q. When you say MAG, what are you referring to?

A. Mothers Against Gangs.

Q. Are you a member of that group?

A. Yes, I am.

\* \* \*

Q. \* \* \* [D]id he say anything besides that?

A. He said this is the—He said Disciple love, MAG killer, Disciple Nation. ***

\* \* \*

Q. Now, did Mr. Frigo say anything to you at that time?

A. He was saying Disciple Nation. This is their turf. They do what they want. Shut up, go in the house. And I just kept telling them that the police were going to come. Why don't they just leave."

Cruz's mother, Sherry Guzman, then came to her house. Defendant went "nose to nose" with her "and told her she was dead." Cruz's mother called the police and Chicago Housing Authority (CHA) security. Guzman returned outside. Defendant told her that "[w]e already threatened your daughter once. Put a bullet in her head. And Anthony, Frigo said, he would throw a cocktail bomb in her house." The CHA security arrived at about 12:30 p.m. and the group fled the scene. The Chicago police later arrived at about 1:30 a.m.

Defendant and Frigo testified at trial. Both denied making any threats. Defendant admitted arguing with Cruz and swearing at her. Frigo offered the testimony of five other witnesses who testified that he was not on Cruz's porch during the argument which involved Cruz.

Following the evidence, the court found defendant and Palomino guilty of intimidation, but Frigo not guilty. Defendant appeals, alleging that he was not proven guilty of intimidation beyond a reasonable doubt.

■ The Criminal Code of 1961 defines the offense of intimidation as follows:

> "A person commits intimidation when, with intent to cause another to perform or to omit the performance of any act, he communicates to another *** a threat to perform without lawful authority any of the following acts:
>
> (1) Inflict physical harm on the person threatened or any other person or on property." Ill. Rev. Stat. 1989, ch. 38, par. 12—6(a)(1).

The purpose of the intimidation statute is to prohibit the making of specified threats intended to compel a person to act against the person's will, and the gravamen of the offense of intimidation is the exercise of improper influence, the making of a threat with the intent to coerce another. (*People v. Tennin* (1987), 162 Ill. App. 3d 520, 525, 515 N.E.2d 1056; *People v. Hubble* (1980), 81 Ill. App. 3d 560, 563-64, 401 N.E.2d 1282.) Implicit in the word "threat" as it is used in the intimidation statute is the requirement " 'that the expression in its context have a reasonable tendency to create apprehension that its

originator will act according to its tenor.' " (*People v. Gallo* (1973), 54 Ill. 2d 343, 352, 297 N.E.2d 569, quoting *Landry v. Daley* (N.D. Ill. 1968), 280 F. Supp. 938, 962.) Intimidation is a specific intent crime. *People v. Haybron* (1987), 153 Ill. App. 3d 906, 506 N.E.2d 369.

Defendant in this case raises two arguments to support his claim that he was not proven guilty beyond a reasonable doubt. First, Cruz's testimony before she called the police reflects that defendant communicated no threat whatsoever. Second, after Cruz called the police, although defendant then made a threat, the threat was of no moment since Cruz had already called the police.

We affirm defendant's conviction and sentence. Defendant's statements to Cruz must be viewed within their context. A large group of individuals were located on Cruz's back porch refusing to leave. The group was noisy, and Cruz's children were trying to sleep. Twice before Cruz had requested the group to move from her porch. On the third time, Cruz informed them she was going to call the police. Frigo then interjected that he would shoot Cruz and injure her children if she called the police. At about the same time, defendant told Cruz the following:

> "He was staying there representing, saying shut the F-up, get in the F-ing house. Why don't you stay there, mind your own business. This is Disciple Nation turf. Shut up."

Cruz at that point closed the door.

Cruz then testified that, after she called the police, she returned to the porch. She told the group that she had called the police. Defendant then stated to her:

> "He said didn't you hear what Peter said. Whjich [*sic*] · is Anthony. He said if you call the police, I am going to put a bullet right the [*sic*] through the middle of your head. He explained to me how he was going to make a cocktail bomb. He was gone go to [*sic*] put gasoline in a bottle, put a rag on it, light it and throw it in my house. And if that didn't take care of my kids, he then would take care of my kids."

Defendant also told Cruz's mother that "[w]e already threatened your daughter once. Put a bullet in her head."

■ We believe that the trier of fact could conclude beyond a reasonable doubt that defendant committed the offense of intimidation. Defendant's conduct after Cruz telephoned the police demonstrates that defendant was personally renewing the previous threat. Whether Cruz had in fact called the police as she said she had is not a relevant inquiry. It is sufficient under the intimidation statute that defendant

specifically intended his threat to coerce Cruz to omit calling the police. Again, whether she already had is irrelevant.

For the foregoing reasons, defendant's conviction and sentence are affirmed.

Affirmed.

MANNING, P.J., and BUCKLEY, J., concur.