THE PEOPLE OF THE STATE OF ILLINOIS, ) APPEAL FROM THE 
 ) CIRCUIT COURT OF 
 Plaintiff-Appellee, ) COOK COUNTY. 
 )
 )
 )
 v. ) No. 94 CR 5195
 ) 
 )
CORNELL BYRD, ) 
 )
 Defendant-Appellant. ) THE HONORABLE
 ) LORETTA C. DOUGLAS 
 ) JUDGE PRESIDING.

 
 JUSTICE COUSINS delivered the opinion of the court: 
 Following a bench trial, defendant, Cornell Byrd, was
convicted of two counts of intimidation for communicating threats
to Chicago police sergeant David O'Callahan and Chicago police
officer Martin Rios. The trial judge sentenced Byrd to an
extended term of 10 years' imprisonment. On appeal, Byrd argues
that: (1) the State failed to prove beyond a reasonable doubt that
he had the specific intent to cause another to perform or omit the
performance of any act; (2) evidence that he was reputed to be a
high ranking member of the El-Rukn street gang, in which he
disciplined fellow gang members and supervised a network of
narcotics traffickers, was not relevant to any of the issues
litigated at trial and was prejudicial; (3) he was denied his
sixth amendment right to effective assistance of counsel because
trial counsel failed to offer evidence that he did not belong to
the El-Rukn street gang in January of 1994 (the month of his
arrest on these charges), and because trial counsel failed to
offer substantial evidence of witness O'Callahan's bias and
hostility towards him; and (4) the trial court abused its
sentencing discretion by imposing the maximum sentence, by making
his sentence run consecutive to a federal sentence under which he
was not serving time at the time of his sentencing hearing, and by
refusing to give him credit for time served while in custody prior
to trial.
 We affirm.
BACKGROUND
 At about 4 a.m. on January 17, 1994, Chicago police officers
Jeffrey Johnson and Eileen Little parked their marked squad car
near The Godfather Lounge on 87th and Harper in Chicago. While
parked near the lounge, a person approached the car and told the
officers that a person inside the lounge had a gun. A short time
later, defendant exited the lounge with three other individuals
and the person identified defendant as the person with the gun. 
Defendant and his companions entered a Jeep vehicle and began
driving westbound on 87th. Another vehicle, a white Jeep,
followed Byrd's vehicle. 
 The officers followed the defendant and curbed Byrd's vehicle
at 87th and Dante. The white Jeep that had been following Byrd
passed the officers and pulled over a quarter of a block ahead of
the officers. Defendant exited the vehicle and Officer Johnson
asked him for his driver's license. Defendant said, "What are you
fucking with me?" Officer Johnson told defendant that he just
wanted to see his license. Byrd gave the officer his license. 
Officer Johnson thought the license appeared to be fraudulent
because the number and letter sequence in the driver's license
number were in reverse order. The officer then asked Officer
Little to run a name check on the license. After receiving
information from the communications center, Officer Johnson told
Byrd that he was under arrest for carrying a fraudulent driver's
license. Sergeant O'Callahan overheard Officer Little's radio
transmissions and proceeded to the scene. 
 The officers then instructed the other passengers to get out
of the car so they could conduct a protective search. Assist cars
and Sergeant O'Callahan then arrived on the scene. At this time,
the white Jeep that had been following Byrd drove away. When
Sergeant O'Callahan arrived, Byrd began to yell at the officers. 
He called the officers "a bunch of pussy motherfuckers," and
claimed he was "tired of being fucked with." He told the officers
that he knew Sergeant O'Callahan and that the sergeant used to be
a commander but was demoted to the rank of sergeant because of him
(Byrd) and the El-Rukns. Furthermore, Byrd told Sergeant
O'Callahan that his men were willing to die for him and, if he
gave the order, they would bust O'Callahan in the mouth and take
the rap for it. He also told the sergeant, "Look, Johnny Fort and
them were behind, you missed it all, we just dropped off a couple
of kilos and if I wanted to I could have all of you all shot." 
Sergeant O'Callahan told Byrd that the officers did not need "all
this showboating." Then the sergeant put Byrd in the back of a
squad car. 
 Byrd was then transported to the fourth district police
station and placed in an interview room with Charles Adams, one of
the other passengers who had been arrested. One of Byrd's hands
was handcuffed to a wall. Officer Little stayed in the interview
room for some period of time to prepare the arrest report and
other paperwork. Officer Johnson was in and out of the room
periodically. Officer Johnson, Officer Little, and Sergeant
O'Callahan all testified that Officer Rios was also present in the
interview room as well. Sergeant O'Callahan entered the room to
supervise the arrest procedures. At that time, Byrd said to
Sergeant O'Callahan: 
 "Come a little closer. Why don't you step a little closer. 
 I'll give you a real case, come a little closer so I can
 smack the shit out of you. I'm going to knock you on your
 ass and hit you in your head * * * " 
Officer Johnson and Officer Little testified that they did not
hear Byrd say to them or to Sergeant O'Callahan that he was going
to hurt or kick someone if they did not let him go, but that Byrd
did say to Sergeant O'Callahan, "I'll get you later on, don't
worry about it." At this point, Officer Little left the interview
room to write up the charges of intimidation. Byrd then said to
Sergeant O'Callahan: 
 "Oh you're not going to be arresting me or anybody else. 
 Look, you ain't going to be arresting nobody. We'll be
 dealing drugs anytime we want and I'll shoot you in the head
 * * * and I'll not put a cluster in your head."
Byrd then pointed at Officer Martin Rios and continued:
 "You see that bulletproof vest? We teach our men to shoot
 above that bulletproof vest, and when we do it we don't put a
 cluster in your head, put one neat hole between your eyes so
 you guys will be eating worms in your graves * * * I'm going
 to shoot you right between the eyes."
O'Callahan left the room but later returned. At that time, Byrd
said:
 "You know I'm a general. Look, you don't think I could have
 you killed? If I order this man here to kill you he'll do
 it. [Byrd turned to Adams] If I order you [referring to
 Adams] to shoot this man in the head or shoot these guys in
 the head, you have to do it, isn't that correct?"
Adams responded, "Yes I would."
 O'Callahan left and returned with Lieutenant Boreczky. 
O'Callahan introduced Boreczky. Byrd told Boreczky, "I'll kick
your ass too," and repeated a statement he had previously made:
"If you continue to fuck with me and try to arrest me I will kill
you or I will have my men kill you, they will shoot you in the
head." At the bench trial, Adams testified that Byrd and
O'Callahan had a shouting match but that Byrd did not say he would
shoot O'Callahan or make arrangements for him to be shot.
 Lieutenant Boreczky contacted Assistant State's Attorney
Rabinovitz, who was assigned to felony review at the time. ASA
Rabinovitz did not bring charges and the lieutenant made an
override of that decision. Later, however, Mary Kay Moore, an
assistant State's Attorney assigned to the gang unit, concurred in
the override of the charges.
 The trial court found defendant guilty of both counts of
intimidation. During post-trial matters, defendant was arrested
by federal marshalls and imprisoned. At the sentencing hearing,
it was revealed that, in 1988, defendant was convicted in federal
court of conspiracy to defraud the United States government and
arson. He was released on parole from federal prison on August
17, 1989. The judge sentenced Byrd to 10 years' imprisonment to
be served consecutively to the federal conviction.
 We affirm.
OPINION
 I
 Byrd first contends that the State failed to prove beyond a
reasonable doubt that Byrd had the specific intent to cause
another to perform or to omit the performance of any act and,
therefore, failed to establish that Byrd committed the crime of
intimidation. If, after viewing the evidence in a light most
favorable to the prosecution, any rational trier of fact could
have found each element of intimidation beyond a reasonable doubt,
we must affirm defendant's conviction. People v. Collins, 106
Ill. 2d 237, 261, 478 N.E.2d 267 (1985).
 The trial court found defendant guilty of intimidation. The
pertinent portions of the intimidation statute state: 
 "(a) A person commits intimidation when, with intent to
 cause another to perform or to omit the performance of any
 act, he communicates to another, whether in person, by
 telephone or by mail, a threat to perform without lawful
 authority any of the following acts:
 (1) Inflict physical harm on the person threatened or any
 other person or on property * * *." 720 ILCS 5/12-6
 (a)(1)(West 1994).
The purpose of the intimidation statute is to prohibit the making
of specified threats intended to compel a person to act against
the person's will, and the gravamen of the offense of intimidation
is the exercise of improper influence, the making of a threat with
the intent to coerce another. People v. Maldonado, 247 Ill. App.
3d 149, 153, 617 N.E.2d 236 (1993), citing People v. Tennin, 162
Ill. App. 3d 520, 525, 515 N.E.2d 1056 (1987). Implicit in the
word "threat" as it is used in the intimidation statute is the
requirement that the expression, in its context, has a reasonable
tendency to create apprehension that its originator will act
according to its tenor. People v. Maldonado, 247 Ill. App. 3d at
153-54, quoting People v. Gallo, 54 Ill. 2d 343, 352, 297 N.E.2d
569 (1973). Intimidation is a specific intent crime. People v.
Haybron, 153 Ill. App. 3d 906, 908, 506 N.E.2d 369 (1987). Intent
may be deduced by the trier of fact from the facts and
circumstances surrounding the offense. People v. McKendrick, 138
Ill. App. 3d 1018, 1028, 486 N.E.2d 1297 (1985). We believe the
State has sustained its burden of establishing that defendant
possessed the specific intent to intimidate Sergeant O'Callahan
and Officer Rios. 
 Defendant raises three points to support his claim that he
was not proven guilty beyond a reasonable doubt. First, Byrd
argues that no argument can be made that he was trying to coerce
Sergeant O'Callahan and Officer Rios to release him on the
fraudulent driver's license charges because Officers Johnson and
Little had already arrested him for this charge before O'Callahan
and Rios arrived at the scene at 87th and Harper. Second,
defendant argues that in those cases in which intimidation charges
have been upheld, defendants referred to specific conduct they
wished the victims not to take. Defendant maintains that no such
references or conditions can be found in any of the statements he
is alleged to have made to O'Callahan and Rios. Third, Byrd
argues that the State's claim that he threatened the officers so
they would not investigate him in the future must fail because no
specific investigation was being conducted against him at that
time. 
 We disagree with defendant's contentions and find People v.
McKendrick instructive of this issue. In McKendrick, the
defendant attempted to prevent complainant from testifying against
him by threatening her with physical harm. He told her that he
had been in jail for three weeks and that she "had done this to
him." McKendrick, 138 Ill. App. 3d 1018, 1028. Defendant raped
complainant and told her that she should not "go through with
this" and that he would leave her alone if she would "just stop
this whole thing." McKendrick, 138 Ill. App. 3d 1018, 1028. The
appellate court held that the trial court properly inferred an
intent to prevent complainant from testifying about the pending
charges from defendant's words and actions and the surrounding
circumstances, despite defendant s lack of specificity of what act
he wished complainant to perform or omit. In the instant case,
defendant told the police officers, inter alia, that he would have
his men shoot the officers if they continued to try and arrest him
and mess with him. Defendant's statements to Sergeant O'Callahan
and Officer Rios must be viewed in their context. The trial judge
heard this testimony and viewed the demeanor of the witnesses. 
She decided the State had met its burden of proof beyond a
reasonable doubt and we agree.
 II
 Defendant also contends that evidence that he was reputed to
be a high ranking member of the El-Rukn street gang, for which he
disciplined fellow gang members and supervised a network of
narcotics traffickers, was not relevant to any of the issues
litigated at trial and was prejudicial. Specifically, he
complains of Sergeant O'Callahan's testimony relative to the
history and organization of the El-Rukn street gang and Byrd's
specific function in the gang as a general. Defendant contends
that this evidence was relevant to neither the officer's
perception of the alleged threats nor the accused's ability to
carry out the alleged threats because neither matter is an element
of the offense of intimidation. In response, the State argues
that such evidence was relevant in determining whether defendant's
statements reasonably tended to create apprehension that defendant
would carry out his threats. 
 The intent which must be proven by the State in an
intimidation case is not the intent to carry out a threat but the
intent to "cause another * * * to omit the performance of any
act." People v. Bergin, 227 Ill. App. 3d 32, 47, 590 N.E.2d 939
(1992). Therefore, the issue in this case is whether the
defendant s words had a reasonable tendency, under the
circumstances, to place the officers in fear that the defendant
would perform his threatened act. People v. Verkruysse, 261 Ill.
App. 3d 972, 975, 639 N.E.2d 881 (1994). Here, evidence of
defendant's gang affiliation was not offered to show whether Byrd
actually would carry out his threats. See Bergin, 227 Ill. App.
3d at 46 (court held that proof of intimidation was not undercut
by the unlikelihood that defendant would have harmed the victim's
children due to his good relationship with the children). Rather,
the evidence was relevant to and probative of defendant's intent. 
See People v. Jones, 161 Ill. App. 3d 688, 698, 515 N.E.2d 166
(1987). The evidence explained why he threatened the officers in
the way that he did and why those threats from this particular
defendant, whom the officers knew had been a member of the El-
Rukns, had a reasonable tendency, under the circumstances, to
place the officers in fear that defendant would shoot them in the
head if they did not act accordingly. 
 We agree with the State that evidence about the El-Rukns'
history of violence and Byrd's role in the El-Rukns supported the
assertion that defendant s threats to shoot the officers in the
head created the apprehension that Byrd would act according to his
threats. Therefore, defendant's gang membership was inextricably
related to the charges against him and was properly admitted at
trial.
 Regardless of whether the evidence was properly admitted,
defendant has failed to show that such admittance was prejudicial. 
Defendant has not established that the trial court relied upon
O'Callahan's statements about the El-Rukn gang in finding
defendant guilty, or that the trial judge failed to consider only
competent evidence against the defendant. We must presume that
the trial court considered only competent evidence unless the
contrary affirmatively appears of record. People v. Schmitt, 131
Ill. 2d 128, 138-39, 545 N.E.2d 665 (1989). Based upon training
and experience, a trial judge, acting as a trier of fact, is
generally believed to have a superior ability to restrict the use
of improper evidence and to consider only competent evidence. 
People v. Crossley, 236 Ill. App. 3d 207, 218, 603 N.E.2d 575
(1992). Defendant points out that, initially, the trial court
overruled defendant's objections to testimony regarding
defendant's connection with the El-Rukns, but then later sustained
an objection after asking the State to explain the testimony's
relevance. There is nothing in the record to indicate that the
trial court relied upon those statements that were found to be
irrelevant. In finding defendant guilty, the judge made no
reference to the gang activity. To the contrary, the court
acknowledged the evidentiary problem presented by the testimony
and assured the defendant that it would ignore the evidence. 
During the latter part of O'Callahan's testimony, defense counsel
objected when O'Callahan testified about his knowledge of
defendant's role and reputation in the El-Rukns. The court
responded, "It's not relevant, but there's no jury present. I
will just ignore it. Okay." Consequently, we hold that defendant
has not established that he was prejudiced by this evidence.
 III
 Defendant further argues that his conviction should be
reversed because he was denied his sixth amendment right to
effective assistance of counsel where, trial counsel failed to
offer evidence that he did not belong to the El-Rukn street gang
at the time of the incident at issue, as he had separated from the
gang in 1981. Defendant also argues that he was denied effective
assistance of counsel where trial counsel failed to offer evidence
of O'Callahan's bias and hostility toward the defendant. He urges
that such evidence would have been classic proof of prejudice on
O'Callahan's part and would have, if used, cast considerable doubt
on O'Callahan's credibility.
 A two-part test of effective assistance of counsel was
adopted by the Illinois Supreme Court in People v. Albanese, 104
Ill.2d 504, 473 N.E.2d 1246 (1984). Under this test, a defendant
must establish that counsel s representation fell below an
objective standard of reasonableness and that there is a
reasonable probability that, were it not for counsel s
unprofessional errors, the result of the proceeding would have
been different. Albanese, 104 Ill. 2d at 525. A reasonable
probability is a probability sufficient to undermine confidence in
the outcome. Albanese, 104 Ill. 2d at 525. Furthermore, the
deficiency in counsel s performance must be prejudicial to the
defense in order to constitute ineffective assistance. People v.
Whitehead, 169 Ill. 2d 355, 380, 662 N.E.2d 1317 (1996). 
 A court need not determine whether counsel's performance was
deficient before examining the prejudice suffered by the defendant
as a result of the alleged deficiencies, if it is easier to
dispose of an ineffectiveness claim on the ground of lack of
sufficient prejudice. Albanese, 104 Ill. 2d at 525. Determining
the prejudice component of this analysis entails more than
applying an outcome-determinative test. The defendant must show
that counsel s performance rendered the result of the trial
unreliable or the proceeding fundamentally unfair. Whitehead, 169
Ill. 2d at 381, citing People v. Mahaffey, 165 Ill. 2d 445, 458,
651 N.E.2d 174 (1995). Resolution of such claims based only on
the prejudice component involves looking at the findings
unaffected by error on remaining findings and answering, in the
end, whether it was reasonably likely that the decision would have
been different. Whitehead, 169 Ill. 2d at 381. Under this
analysis, we do not find the conduct of Byrd's trial counsel to be
ineffective. Our review of the record demonstrates that assuming,
arguendo, that all of the alleged errors constituted ineffective
representation, these errors would not have altered the result in
this case. Therefore, there is no need to review the individual
claims of inadequate representation to determine whether counsel
acted within the range of reasonable professional assistance. 
Even if defendant s trial counsel had offered evidence of Byrd s
separation from the El-Rukns, or O Callahan s bias toward Byrd, it
is reasonably likely that defendant would still have been found
guilty beyond a reasonable doubt. On three separate occasions,
defendant told the officers that he would shoot them. These
statements were heard by several witnesses. We therefore conclude
that trial counsel s failure to offer evidence of Byrd s
separation from the El-Rukns and O Callahan s bias toward Byrd had
no prejudicial effect on defendant's defense. 

 IV
 Byrd also contends that the trial court improperly sentenced
defendant to the extended-term sentence of 10 years imprisonment,
erroneously ordered the sentence to run consecutive to a federal
sentence, and refused to give defendant credit for the amount of
time he spent in custody. 
 We agree with the State that Byrd waived these sentencing
issues by failing to object at the sentencing hearing and failing
to raise these issues in a post-sentencing motion. An amendment
to section 5-8-1(c) of the Unified Code of Corrections requires: 
 A defendant's challenge to he correctness of a
 sentence or to any aspect of the sentencing hearing shall be
 made by a written motion filed within 30 days following the
 imposition of sentence. 730 ILCS 5/5-8-1(c) (West 1994)
 (eff. August 11, 1993).
However, even if Byrd had not waived these arguments, we would
find his arguments meritless. 
 First, relative to the trial court s judgment to impose the
maximum extended-term sentence, we agree with defendant s
concession that the question of what sentence to be fashioned in a
criminal case is a matter to be settled by the trial judge. The
imposition of a sentence is a matter of judicial discretion and,
absent an abuse of this discretion, the sentence of the
trial court may not be altered upon review. People v. Perruquet,
68 Ill. 2d 149, 153, 368 N.E.2d 882 (1977). Defendant argues that
the maximum of 10 years is not warranted because he peacefully
submitted to the arrest and never posed a danger to any of the
officers. 
 Furthermore, defendant argues that nothing happened to the
officers following his arrest thus showing that their fear of him
and his alleged gang was exaggerated and unwarranted. Defendant
fails to recognize that the essence of the crime of intimidation
lies in the exercise of improper influence. People v. Tennin, 162
Ill. App. 3d 520, 525, 515 N.E.2d 1056 (1987). Defendant was
charged with the offense of intimidation for threats he made to
the officers during his arrest. Therefore, the defendant's lack
of action against the officers following his arrest is irrelevant
to the threats at issue in these charges. Accordingly, we find
that the trial court did not abuse its discretion in sentencing
defendant to the maximum of 10 years imprisonment. 
 Defendant next contends that his sentence should not have run
consecutive to his federal court conviction for conspiracy to
commit arson because he was not serving any unexpired federal
sentence at the time of the sentence in this case. Defendant
maintains that federal authorities did place a parole hold on
him at the time he was taken into custody in the case sub judice;
however, as of the date of sentencing there had been no federal 
action on the parole case. Therefore, defendant argues, the trial
court did not have the authority under section 5-8-4(a) of the
Unified Code of Corrections (730 ILCS 5/5-8-4(a)(West 1994) to
impose a consecutive sentence. We also disagree with this
contention. 
 A court may order a sentence to run consecutive to any prior
convictions, even where sentencing on those convictions has not
yet occurred but is anticipated in an upcoming parole revocation
proceeding. Where the case number (i.e., proper identification) of
the parole revocation proceeding is in the record, sentences
ordered to run consecutively to sentences for parole revocations
have been upheld as sufficiently complete, even where those
sentences are merely anticipated and have not yet been imposed.
People v. Simmons, 256 Ill. App. 3d 651, 654, 628 N.E.2d 759
(1993).
 In 1983, defendant was convicted in federal court of the
offense of conspiracy to commit arson and was given a 12-year 
year prison term. He was paroled from the Federal Bureau of
Prisons in 1989. At the time of sentencing in the instant case,
defendant was incarcerated for violating his parole on the
conspiracy charge. At the sentencing hearing, the trial judge
stated:
 Okay. All right. The Court exercises its discretion in
 applying the extended term here. I am going to sentence the
 Defendant to the maximum term permissible by law, 10 years in
 the Illinois Department of Corrections. No credit. Do you
 have the case number on the Federal conviction? I will put
 it here on the record for the consecutive sentencing. 
The State then gave the court the case number for defendant s
federal court conviction. Although no action had yet been taken on
defendant's parole violation, the trial court sufficiently
identified the case number his sentence was to run consecutive to,
as is required. It was of no consequence that sentence had yet to
be imposed. Accordingly, any vacation of any portion of
defendant's sentence would be improper.
 Defendant s final contention relative to sentencing is that
the trial court was wrong for refusing to grant him any credit for
time spent in custody awaiting trial on these charges. In his
appeal, however, defendant fails to specifically delineate the
period of time allegedly spent in custody on the charges. It is
defendant s burden to preserve and present a sufficient record of
the asserted error. People v. Smith, 106 Ill. 2d 327, 478 N.E.2d
357 (1985). Defendant has not provided this court with a
sufficient record by which this court can review this issue. 
Therefore, we decline to examine this issue since it is not
properly presented for review. 
 For the reasons cited herein, the judgment of the circuit
court of Cook County is affirmed.
 Affirmed. 
 MCNULTY, P.J., and HOURIHANE, J., concur.