THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES PETERSON *et al.*, Defendants-Appellants.

Second District No. 2—97—0017

Opinion filed August 19, 1999.

1092

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, for appellants.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), and Robert E. Davison, of DePaepe & Davison, of Springfield, for the People.

JUSTICE SLATER delivered the opinion of the court:

Defendants, James and Janice Peterson, were charged with five counts of intimidation (720 ILCS 5/12—6 (West 1996)) and four counts of threatening a public official (720 ILCS 5/12—9 (West 1996)). Following a jury trial, the defendants were found guilty but mentally ill (GBMI). The defendants were sentenced to concurrent five-year terms of imprisonment for intimidation; the convictions for threatening a public official were vacated. On appeal, defendants contend (1) that the State failed to prove them guilty of intimidation beyond a reasonable doubt; (2) that the application of the GBMI statute resulted in a denial of due process; (3) that the intimidation statute, as applied to the defendants, violated their rights to freedom of speech and free exercise of their religious beliefs; (4) that defense counsel was ineffective; and (5) that the improper admission of certain testimony deprived them of a fair trial. We affirm.

## Introduction

The charges against the defendants arose from letters they sent to three Lake County circuit court judges, an administrator for the Village of Hawthorn Woods (the village), and a newspaper reporter. Defendants had been involved in a dispute over the construction of a house in Hawthorn Woods. The village eventually brought an action to demolish the defendants' partially constructed home. The house was demolished pursuant to the order of the circuit court of Lake County. Thereafter, defendants sent the letters that formed the bases for the intimidation charges.

## Facts

The trial began with the testimony of John Kalmar, village administrator for Hawthorn Woods. Kalmar's duties included overseeing the day-to-day operations of the village and the enforcement of codes and ordinances. In December 1991 a building permit for the construction of a residential structure was issued to the defendants. The permit was good for 15 months. The defendants listed themselves as the general contractors and indicated that they had no architect or builder. They worked with the village architect to bring their plans into compliance with the village codes and ordinances.

The permit expired in February 1993, before the construction was completed, and the defendants applied to renew it. Kalmar said there was nothing unusual about that. The permit was extended for seven months through September 30, 1993. The extension was longer than the three months that usually were allowed because the defendants were doing the work themselves and had run into some difficulties.

According to Kalmar, defendants' progress on the home was very slow. The construction site was surrounded by upscale homes and neighbors began complaining to Kalmar about the uncompleted project. Kalmar said he contacted the defendants in August 1993 to remind them of the imminent permit expiration date. The defendants did not apply for another extension.

The day after the permit expired, the Village of Hawthorn Woods issued a stop-work order for the site. The defendants did not apply for a new permit. They did write letters to Kalmar concerning the situation. Kalmar tried to call the defendants several times and left messages on their answering machine. His calls were not returned. Both Kalmar and the village president tried to arrange a meeting with the defendants, but they did not attend. Late in October 1993, the village board authorized Kalmar to take legal action against the defendants, either to force them to complete the project or to obtain a court order for its demolition.

Kalmar and the defendants continued to exchange letters through April of 1994. Kalmar said that his letters to the defendants directed them to go to the village architectural review commission and request the renewal of the permit. The defendants did not do so. They informed Kalmar that they believed that some sort of "grandfathering" provision rendered a permit extension unnecessary and that they had an unlimited amount of time to complete their project, an assumption that was not accurate.

Kalmar and the village attorney commenced an action against the defendants in the Lake County circuit court in April 1994. The case, which was litigated for about a year, began before Judge Stephen Walter. Appearances also were made before Judge William Block. The final ruling was entered by Judge Terrence Brady.

Judge Walter testified that the defendants represented themselves in the civil action filed by the Village of Hawthorn Woods. The defendants appeared before Judge Walter 10 or 12 times. In December 1994, Judge Walter ruled for the village. Rather than ordering demolition at that time, however, he gave the defendants 30 days in which to obtain a building permit and 90 days in which to make substantial progress toward the completion of the construction project. Because substantial progress was not made, the case was eventually set for a hearing on the village's request for a demolition order. On the day set for the hearing, May 5, 1995, Judge Walter was out of town. Judge Brady was assigned to handle Judge Walter's motion call that morning. Judge Brady testified that when the case was called, he asked the defendants if they wanted a continuance to hire a lawyer. The defendants said that they did not want to participate in a hearing.

They told Judge Brady that they believed the court did not have the authority to order the demolition of their property. Based on findings of fact made earlier by Judge Walter, Judge Brady issued the demolition permit to the village. However, the enforcement of the order was stayed for 30 days.

After receiving adverse rulings from the Appellate Court, Second District, the defendants' house was demolished in September 1995. About two weeks after the demolition, the village attorney received a letter from the defendants requesting the return of building materials, tools, and accessories that had been stored in the structure. The defendants were given an opportunity to pick the things up but did not do so. Thereafter, Kalmar received letters from the defendants demanding money. The defendants also filed a lawsuit in federal court seeking $10 million compensation for their losses.

Around February 20, 1996, two letters in a single envelope addressed to Kalmar were delivered to the village hall. The letters were admitted into evidence at trial and read to the jury. The first letter was signed "Almighty God" and the second was signed "Jim and Jan Peterson, Servants of Almighty God." Both were dated February 19, 1996. The first letter read in part:

"I know who your father is—the Father of Lies. Your time is short, too, like your father, but for now you will have to decide how many of your servants you want Me, God Almighty, Lord of Lords, to take before you pay My servants, Jim and Jan Peterson, for what you have stolen from them. You shall lose much more money and people unless you quit now. It's up to you. I can kill all your servants if you like now, or we can end this now by paying My servants for their losses and then some, or else you will lose your life, for your time is short also.

I have spoken. Do it now or be destroyed, you son of Satan.
 Almighty God

P.S. I will take everything you have if need be—wife, kids, all possessions, and any further contact you have with your father, who is not happy with you. You decide. It's up to you, for I am God Almighty, Mighty Lord of Lords. Precious are My servants in My eyes."

The second letter read in part:

"[W]e are giving you five days to settle with us for the amount of eight million dollars ***.

If this is not done in five working days from receipt of this letter, my Father, God Almighty, shall take your life. Payment should be made out in blank cashier's checks in the amount of $100,000 each, with a total of 80 checks. If this is not done and you don't want to participate, my Father, God Almighty, shall take your life now,

today. You decide. You have five days, and if you try anything else like you have been, your life will be taken sooner. It is up to you, and nobody on the TV or news has to know or ever know.

This is your last chance—do or die—for your father has already made arrangements with my Father, for if you double cross us at any time, your life will be taken."

This letter also contained a two-page "P.S. from Almighty God" containing statements such as "[i]f you do one more double cross *** you shall be put to death," "[y]ou can die now or you can live a few more years," and "I am coming quickly to you, maybe even tonight."

Kalmar testified that after reading the letters he felt shock and concern for his family. He took the letters to be a death threat directed at himself and his family, informing him that if he did not pay the defendants, he would die. On cross-examination, Kalmar acknowledged that the letters stated action that Almighty God would take if he did not act and did not state that the defendants themselves would do anything.

Judge Stephen Walter testified that the defendants were scheduled to appear in court on February 22, 1996. On that morning Judge Walter received a letter dated February 19. The letter stated in part:

"This is a message from Almighty God. You, sir, have taken property from my two servants, Jim and Jan Peterson, who [sic] I love and watch over. For they are mighty in my sight and do what I say because they love Me. You, sir, have two days to reverse the decision that is a fraud and corrupt. You take orders from John Kalmar because you do what he says but not from me—God Almighty. He, John Kalmar, is a liar, and the Petersons tell the truth and are honest and holy; but you follow a liar and a cheat and a servant of Satan who is also a son of Satan. If you don't reverse that decision today—the day you receive this letter—and I mean right now—and destroy this letter too—your life, Judge Brady's life, and Judge Block's life will be required of you.

Please get down on your hands and knees and repent and ask God Almighty to forgive you. Do it now—right now—or all your judges' lives will be required of you. Do you hear Me? So do it right now or all three of you die. Do I make Myself perfectly clear?

*** Almighty God

P.S. This letter, Judge Walter is not a joke, for I watch you even as you read this letter. Do not snicker or laugh, for I, God, can take your life this very instant ***.

* * *

I hope you change your mind, because I know until you have read this letter, you would have died as soon as you made the decision in court. You would have dropped dead with the last words of

your decision rendered. It's up to you now. I can say no more. I do not threaten anybody. ***

***

*** Please weigh the cost before you step into that courtroom this morning."

Judge Walter testified that he interpreted the letter as a threat to kill him if he did not reverse Judge Brady's ruling on the defendants' case. Judge Walter contacted the State's Attorney's office and relocated members of his family in reaction to the letter.

Judge William Block and Judge Terrence Brady received the same letter that had been sent to Judge Walter, along with a cover letter that stated in part:

"Attached is a letter I have sent to Judge Walter. If you don't do what it says too and stand for truth and your oath of office, you shall likewise perish if you don't repent right now to me, God Almighty, and get down on your hands and knees and ask for a pardon from Me.

If you go to the police with this letter instead of destroying it first (take notes right now on what to do), you shall die within minutes of finishing this letter because you are laughing at and mocking God Almighty."

Chris Heidenrich, a newspaper reporter, wrote several articles about the defendants' dispute with the village and the demolition of their house. Heidenrich received a letter, also dated February 19 and signed "Almighty God," which accused her of writing false stories about the defendants. The letter urged her to "write a story of truth, or else" and contained statements such as "heed my warning or you shall die soon," "your life will be taken by morning," and "I can see everything and will take your life in a flicker of my eyelid."

The Lake County sheriff's department began an investigation and obtained a search warrant for the defendants' home. Police found an empty box for a .38-caliber handgun, receipts from a gun shop, and several human silhouette targets with bullet holes. Defendants were eventually arrested on March 12 at O'Hare Airport when they came to collect mail from a post office box they had established there. The contents of the defendants' van included two .38-caliber pistols, a .357 Magnum revolver, boxes of ammunition, and more targets. The guns were found in a duffel bag and were not loaded.

After their arrest, the defendants were interviewed by Douglas Heilman, a special agent for the Federal Bureau of Investigation. Mrs. Peterson told Heilman that she had typed the letters to Kalmar, Heidenrich, and the three judges on her home computer. According to Mrs. Peterson, God communicated with her husband, he wrote what

God told him, and she typed what her husband wrote while correcting any grammar or spelling errors. She and her husband did not intend to harm anyone; they were merely communicating God's words. They had bought the guns as protection against the police because God had indicated that Mr. Peterson would be harmed if they won their lawsuit.

Heilman also spoke with Mr. Peterson, who admitted sending the letters. He would listen to what God wanted communicated, tell his wife, and she would type the letters. Mr. Peterson told Heilman that he had no intention of killing or harming anyone; he was just relaying messages from God. The weapons had been purchased as protection against the police, who he thought were going to harm him.

After the State rested its case, Mrs. Peterson testified regarding the problems the defendants encountered in building their home in Hawthorn Woods. After the house had been demolished, the defendants began to receive instructions from God concerning various aspects of their lives, including what clothes to wear, what to eat, and when it was safe to run the washer and dryer. The defendants spent weeks locked inside their home in Wheeling with the blinds drawn and the lights out so that evil people who were watching them would not know they were home.

Mrs. Peterson typed over 50 letters, directed to family members, friends, religious leaders, the village attorney, the Attorney Registration and Disciplinary Commission, the judges, and others. Mr. Peterson would write notes on manila folders, looking as if he was being told what to write, and Mrs. Peterson would type the notes. Sometimes God would tell them to make changes or add a postscript. The letters were not mailed until God instructed them to do so; some were never mailed.

After the defendants were arrested, Mrs. Peterson agreed to talk to the authorities because she had done nothing wrong and had nothing to hide. She thought a mistake had been made and she had no idea that there were warrants out for their arrest or that the police were looking for them. Mrs. Peterson did not consider the letters to be threatening or think they would frighten anyone. The words came from God, not from the defendants.

Mr. Peterson did not testify. The defense presented the testimony of two mental health experts, psychologist Orest Wasyliw and psychiatrist Jonathan Kelly. Dr. Wasyliw examined the defendants and he concluded that they were unable to appreciate the criminality of their conduct. According to Dr. Wasyliw, while the letters could be perceived as threatening, the defendants did not believe that they were making threats; they were simply doing God's will. Dr. Kelly agreed with Dr. Wasyliw's conclusion that the defendants were unable to appreciate the criminality of their conduct.

In rebuttal, the State called Steven Rothke, a clinical psychologist. Dr. Rothke agreed with the major diagnosis of Dr. Wasyliw and Dr. Kelly that the defendants suffered from a shared delusional or shared psychotic disorder. However, in Dr. Rothke's opinion, those disorders did not render the defendants unable to appreciate the criminality of their acts.

Following closing arguments, the jury found the defendants guilty but mentally ill. After the denial of the defendants' original and supplemental posttrial motions, the defendants were sentenced to concurrent five-year terms of imprisonment, and this appeal followed.

## Analysis

Defendants initially contend that the State failed to prove them guilty of intimidation beyond a reasonable doubt. Defendants argue that the letters did not state that *they* would harm the recipients but only that *God* would do so if they did not obey his wishes. Because the letters did not indicate that the defendants themselves would take any action, they could not reasonably be construed as a threat. Moreover, defendants maintain that the circumstances surrounding the preparation and making of the letters failed to establish the defendants' specific intent to threaten the recipients, which defendants assert is a necessary element of proof of the charge of intimidation. According to defendants, the evidence establishes that the letters were nothing more than a sincere expression of their religious beliefs, beliefs which permeated and influenced every aspect of their lives.

■ ■ When faced with a challenge to the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985). The offense of intimidation, as charged in this case, is defined as follows:

"§ 12—6. Intimidation.

(a) A person commits intimidation when, with intent to cause another to perform or to omit the performance of any act, he communicates to another, whether in person, by telephone or by mail, a threat to perform without lawful authority any of the following acts:

1) Inflict physical harm on the person threatened or any other person or on property[.]" 720 ILCS 5/12—6(a) (West 1996).

■ The purpose of the intimidation statute is to prohibit the making of threats intended to compel a person to act against his will, and the gist of the offense is the exercise of improper influence—the mak-

ing of a threat with the intent to coerce another. *People v. Byrd*, 285 Ill. App. 3d 641, 647, 673 N.E.2d 1071 (1996); *People v. Maldonado*, 247 Ill. App. 3d 149, 153, 617 N.E.2d 236 (1993). As used in the intimidation statute, the word "threat" implicitly requires that the expression, in its context, has a reasonable tendency to create apprehension that its originator will act according to its tenor. *Byrd*, 285 Ill. App. 3d at 647; *Maldonado*, 247 Ill. App. 3d at 153-54.

In this case the defendants acknowledge that the letters were sufficient to make a reasonable person "suspect that the sender was a religious zealot who might be capable of doing more than mail a letter." They also admit that the letters may have caused the recipients to fear that the defendants might be about to do something violent. However, argue the defendants, merely causing generalized fear and concern does not amount to intimidation. According to defendants, as long as a person "does not communicate threats to anyone in particular that if [he] do[es] or do[es] not, perform an act, he will cause them physical harm, his conduct is not the crime of intimidation."

■ We agree that conduct that merely causes a generalized sense of fear or nervousness, such as a stranger walking down the street raving and gesturing violently, or yearly predictions by psychics of catastrophic events, would not be the type of threat contemplated by the intimidation statute. However, the letters sent by the defendants were directed at particular individuals and promised that if those persons did not act as directed they would "die soon," "be destroyed," and lose "wife, kids [and] all possessions." Although such threats were purportedly messages from God, there is no question that the defendants produced and sent the letters. Defendants' position essentially appears to be that when a person says, "God will kill you if you don't give me what I want," such a statement is not a credible threat. The test, however, is whether the expression, in context, "has a *reasonable tendency* to create apprehension that its originator will act according *to its tenor.*" (Emphasis added.) *Byrd*, 285 Ill. App. 3d at 647, 673 N.E.2d at 1075. The tenor of the letters was unmistakably hostile, and we do not deem it unreasonable for the recipients to believe that those who acted as God's messengers might also act as his executioners. "When the circumstances are such that the threat of physical harm can be inferred, it is unnecessary that the defendant state exactly how he proposes to harm the victim." *People v. Verkruysse*, 261 Ill. App. 3d 972, 978, 639 N.E.2d 881, 885 (1994) (Barry, J., dissenting); see also *People v. Libbra*, 268 Ill. App. 3d 194, 643 N.E.2d 845 (1994) (finding reasonable inference of threat of physical harm based on "bizarre" communications aimed at victim, including leaving photograph of tombstone at victim's place of business).

Although defendants' argument is not entirely clear, they also appear to argue that the State failed to prove that the letters were specifically intended as a threat to inflict bodily harm. However, while intimidation is a specific intent crime (*Maldonado*, 247 Ill. App. 3d 149, 617 N.E.2d 236), "intent to harm another is not an element of intimidation" (*People v. Proctor*, 85 Ill. App. 3d 190, 195, 406 N.E.2d 570, 574 (1980)). The intent that must be proved is not the intent to carry out a threat but the intent to "cause another to perform or to omit the performance of any act" (720 ILCS 5/12—6(a) (West 1996)). *Byrd*, 285 Ill. App. 3d 641, 647, 673 N.E.2d 1071; *People v. Bergin*, 227 Ill. App. 3d 32, 47, 590 N.E.2d 939 (1992). Intent may be inferred from the facts and circumstances surrounding the offense. *People v. McKendrick*, 138 Ill. App. 3d 1018, 1028, 486 N.E.2d 1297 (1985).

■ Here the letters themselves provided ample evidence of the defendants' intent. The letter to Kalmar demanded $8 million. The letters to the judges gave them two days "to reverse the decision that is a fraud and corrupt" and ordered them to destroy the letters. Chris Heidenrich was told to "write a story of truth." Indeed, the defendants note in their reply brief that "[t]he acts or omissions that God wanted the recipients to perform were clearly specified, as were the consequences of noncompliance." While the defendants argue repeatedly that their only intent was to communicate God's words, the jury was not required to believe them. It is the province of the jury to assess the credibility of the witnesses and the weight to be given their testimony and to draw inferences therefrom. *People v. Brisbon*, 106 Ill. 2d 342, 360, 478 N.E.2d 402 (1985). We conclude that the defendants were proved guilty beyond a reasonable doubt.

■ Defendants next contend that the jury instructions and verdict forms permitting findings of guilty but mentally ill and the resultant GBMI verdicts deprived the defendants of due process. Defendants rely on *People v. Robles*, 288 Ill. App. 3d 935, 682 N.E.2d 194 (1997), which held that the GBMI statute was unconstitutional because it encouraged compromise verdicts and because it placed conflicting burdens on the defendant by requiring him to prove both insanity and mental illness. However, our supreme court recently reversed *Robles* and upheld the constitutionality of the GBMI statute. *People v. Lantz*, 186 Ill. 2d 243 (1999). Since defendants admit that their cases are legally indistinguishable from *Robles*, we must reject their arguments.

■ Defendants next assert that, as applied in this case, the intimidation statute unconstitutionally infringes on their rights to freedom of speech and the free exercise of their religious beliefs. Defendants maintain that the letters were not threats but instead were expressions of their religious beliefs concerning God's expecta-

tions and desires and the consequences of disobeying his word. Defendants compare their conduct to that of parents relaying spiritual guidance to their children or a fundamentalist preacher warning of God's wrath.

The flaw in defendants' argument is their unwillingness to recognize the letters as threats. Defendants' characterization of their conduct as the mere expression of religious beliefs is inconsistent with the jury's verdict and with our ruling that the letters had a reasonable tendency to create apprehension that the defendants would act according to their tenor. "[T]hreats have traditionally been punishable without violation of the first amendment, but implicit in the nature of such punishable threats is a reasonable tendency to produce in the victim a fear that the threat will be carried out." *Wurtz v. Risley*, 719 F.2d 1438, 1441 (9th Cir. 1983). Defendants acknowledge that "the tone of the letters arguably is threatening and *** the letters do contain unambiguous statements to the effect that the failure to comply with God's demands will mean certain imminent death and everlasting damnation at the hands of God." Despite the defendants' insistence to the contrary, not only *could* the victims have construed the letters as threats by the defendants, but they also *in fact* feared for their safety and that of their families. The jury implicitly found that such beliefs were not unreasonable, and we concur in that finding.

> "The State of Illinois unquestionably has a legitimate interest in protecting persons from coercion by threats, even though expression is involved. '[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.' " *Landry v. Daley*, 280 F. Supp. 938, 961 (N.D. Ill. 1968), *rev'd on other grounds sub nom. Boyle v. Landry*, 401 U.S. 77, 27 L. Ed. 2d 696, 91 S. Ct. 758 (1971), quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502, 93 L. Ed. 834, 843-44, 69 S. Ct. 684, 691 (1949).

The jury found that the letters sent by the defendants were threats designed to coerce the victims to comply with the defendants' wishes. As such, they were not constitutionally protected speech, and the application of the intimidation statute did not violate the defendants' rights to free speech or free exercise of their religion. See *People v. Williams*, 133 Ill. 2d 449, 456-57, 551 N.E.2d 631, 634 (1990) (and cases cited therein) (activities that State may validly prohibit are not protected by first amendment merely because some or all elements are verbal).

Defendants further contend that the trial court erred in allowing the victims and other witnesses to testify regarding their reactions to the letters. Each of the witnesses testified that he or she considered the letters to be a threat made on his or her life and/or the lives of family members. Many also indicated being fearful and concerned for their safety and described taking precautions such as moving out of their homes, avoiding public exposure, and implementing security procedures. Defendants maintain that this testimony was irrelevant because the State is not required to prove that the recipients of the letters considered them threatening. Defendants assert that such testimony was likely to inflame the jurors and to confuse them regarding the ultimate issue of fact in the case. We disagree.

■ As we previously indicated, the offense of intimidation requires a threat—an expression that has a reasonable tendency to create apprehension that its originator will act according to its tenor. *Byrd*, 285 Ill. App. 3d at 647; *Maldonado*, 247 Ill. App. 3d at 153-54. This has also been described as an expression of an intent to act that has a reasonable tendency to coerce. See *People v. Gallo*, 54 Ill. 2d 343, 352, 297 N.E.2d 569 (1973). Defendants' position is that one need only examine the letters themselves to determine whether they have a reasonable tendency to coerce or create apprehension; a person's subjective reaction is irrelevant. We believe, however, that the fact that the letters created apprehension is highly indicative of their tendency to create that state. Relevant evidence is that having any tendency to make the existence of a fact which is of consequence to the determination of the action more probable than it would be without the evidence. *People v. Lewis*, 165 Ill. 2d 305, 329, 651 N.E.2d 72 (1995). Testimony that the letters were perceived as threats and engendered fear, while certainly not conclusive, was some evidence of their tendency to coerce and to create apprehension.

Indeed, if the witnesses had testified that they considered the letters to be nothing more than exhortations to live better lives, a practical joke, or, as defendants have argued, merely the expression of certain religious beliefs, such evidence would weigh heavily in favor of acquittal. In other words, while the issue of whether particular words have a reasonable tendency to coerce or cause apprehension is essentially an objective determination, the subjective reactions of the recipients is a proper factor to consider.

"It is not the abstract meaning of words that constitute an expression [of] a threat, but their reasonable tendency under the circumstances to place another in fear that the threat-maker will perform the threatened act. An innocent expression may be threatening because of the ominous circumstances in which *it is*

made. Similarly, a statement that is literally a declaration of intent to do harm to another is not a threat if the context negatives any reasonable apprehension that the speaker intends what he says he intends." *Landry*, 280 F. Supp. at 962.

Here, the defendants sent similar letters to various individuals, each of whom construed those letters as threatening. Defendants' position has been that the letters were not threats but were merely expressions of religious belief. Under such circumstances, the recipients' reactions to the letters were evidence of their tendency to create apprehension, and we find no abuse of discretion in admitting such evidence.

For the reasons stated above, the judgment of the circuit court is affirmed.

Affirmed.

KOEHLER and LYTTON, JJ., concur.