2019 IL App (1st) 180036-U

No. 1-18-0036

Order filed November 26, 2019

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 23707 |
| | ) | |
| ANTONIO MAYORGA, | ) | Honorable |
| | ) | Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm defendant's convictions for aggravated robbery and intimidation where (1) the evidence at trial established each element of the offenses beyond a reasonable doubt; and (2) the convictions did not violate the one-act, one-crime rule.

¶ 2    Following a bench trial, defendant Antonio Mayorga was convicted of aggravated robbery (720 ILCS 5/18-1(b)(1) (West 2012)) and intimidation (720 ILCS 5/12-6(a)(1) (West 2012)) and sentenced to concurrent terms of 12 and 5 years' imprisonment. On appeal, defendant

argues (1) his convictions should be reversed because the State failed to prove the elements of aggravated robbery and intimidation beyond a reasonable doubt; and (2) his intimidation conviction violates the one-act, one-crime rule. We affirm.

¶ 3 Defendant was charged with two counts of kidnapping, one count of vehicular invasion, one count of aggravated robbery, and one count of intimidation stemming from events which took place on November 22, 2013. He was ultimately found guilty of aggravated robbery and intimidation which charged respectively that defendant took property from the person or presence of Jose Tapia by the use of force or by threatening the imminent use of force while indicating he was presently armed with a firearm, and communicated a threat to inflict physical harm upon Tapia with the intent to cause Tapia to drive him to a location.

¶ 4 At trial, Tapia testified that on that date, at approximately 9:30 p.m., he drove to Positanos Pizza to get a pizza to bring home to his family. Tapia saw a man, whom he identified in court as defendant, sitting inside and talking on his phone. Tapia had never seen defendant before.

¶ 5 After Tapia got his pizza, he sat in his car with the windows "cracked" and the doors unlocked. Defendant approached the car on the passenger side and, through the window, asked Tapia if he could give him a ride. Tapia told defendant "no," but defendant kept "insisting" and told Tapia he was "hurt." Tapia saw him limping. Defendant then "threw" his phone through the car window into the front seat as "a sign of good faith" and attempted to give Tapia "his IDs or *** whatever was in his wallet." Tapia told defendant to "take his stuff" because he had to go home. Tapia did not give defendant permission to enter his car, but defendant opened the door and sat in the front passenger seat. Tapia asked defendant to get out numerous times, but

defendant kept asking for a ride. Tapia "finally agreed" to drive defendant where he wanted to go. He told defendant he would "[d]rop [him] off and just be on [his] merry way." Defendant told Tapia to drop him off at a friend's house which was "within a four block radius" of the pizzeria.

¶ 6    During the ride, defendant began telling Tapia about how he was "a bad mother****er" and knew a lot of "gang members" in the area. Defendant also informed Tapia that he could help Tapia "score some drugs" and obtain "girls" for him if he wanted, and wanted to give Tapia his phone number. Tapia was afraid defendant would steal his phone if he showed it to him, so he told defendant his phone number, and defendant called it in the car. Tapia's phone was not charged at the time and did not ring, but his phone recorded defendant's phone number.

¶ 7    When they arrived at defendant's destination, Tapia told defendant he had to get out, because Tapia wanted to leave, but defendant told Tapia to "relax" and did not leave the car. He then told Tapia stories about himself and showed him videos on his phone depicting him "flicking off" police officers, and "getting drunk and doing stuff," and at one point informed Tapia that "he always carried a gun with him."

¶ 8    Tapia saw that defendant had his hands in his pockets and kept "fidgeting," which started to make Tapia nervous. Tapia did not know what defendant wanted because defendant would not get out of his car despite Tapia telling him he had to go. So after five to ten minutes, Tapia got out of the car. He "threw" his wallet containing $25 on the driver's seat, telling defendant to take it. Defendant told him to "chill the f*** out," and "if he wanted to do something stupid that he had his boys like a sound of a whistle or a snap of his fingers, [Tapia would] be surrounded by them." After Tapia threw the wallet, defendant "kept" telling him to get into the car, "shut the

f*** up," and he was "not getting robbed." Tapia "feared for [his] life" and considered running, but it was dark and the neighborhood was "bad."

¶ 9    When Tapia was outside the car, defendant was sitting with his body facing Tapia, and his right hand was in his jacket pocket, extending that portion of his unzipped jacket and pointing it across his body. Tapia was scared. He did not know what was in defendant's pocket, whether "it was a gun or what." Defendant had previously informed Tapia that his daughter's birthday was coming up and he needed money to get her a present. Defendant never directly asked Tapia for money, and specifically told him he was not "stealing [Tapia's] money" and Tapia was "not getting robbed"; however, he told Tapia to get back into the car and would not leave Tapia's car.

¶ 10   Tapia got back into the car, and defendant then told him to drop him off at "his girl's" house, but Tapia did not want to go back to the neighborhood so instead, of his own accord, drove to an automated teller machine (ATM) at a bank to withdraw money from his account for defendant so that he would "leave [him] alone." Tapia told defendant he had "20 more bucks" in his account, which he would give to defendant, "but [defendant] just need[ed] to go." Tapia also hoped to find a security guard there to help him. At the bank, Tapia was unable to withdraw money from his account because he could not remember his PIN. Defendant told Tapia to "get [his] a** back in" the car. Hoping to be able to find a police officer or security officer at a Walgreen's store who could help him, Tapia offered to drive defendant to the Walgreen's so that he could use Tapia's credit card to buy his daughter a present.

¶ 11   The Walgreen's was closed so Tapia continued to drive. At that point, defendant had the $25 from Tapia's wallet that Tapia had given him. Defendant continued asking Tapia to loan him money and telling him that he would pay Tapia back the next day. Tapia told defendant he had

money at home that he would give him. He drove to his house but did not park directly in front because he did not want defendant knowing where he lived. He cut through a neighbor's yard to the alley and jumped his fence to reach his own house. Tapia left defendant in his car. Approximately 30 to 45 minutes had passed from the point defendant had entered Tapia's car at the pizzeria. The entire time Tapia was driving, defendant had his right hand in his jacket pocket. Tapia never saw what, if anything, was in defendant's pocket, but thought it was a gun because he recognized its "silhouette."

¶ 12    Once inside his home, Tapia called the police. A short time after he left defendant outside, Tapia heard defendant screaming and calling for "Jose" while banging on a neighbor's door. Tapia never told defendant his name and assumed defendant learned it when Tapia gave him his wallet. By the time the police arrived, defendant was gone.

¶ 13    One of the police officers used Tapia's cell phone to send a text message to defendant offering him more money in order to induce him to return. Tapia received a text message from defendant that "he really appreciated that [Tapia] came up with the money." Defendant informed Tapia that he would be returning, and Tapia in turn informed the police officers. When defendant returned to Tapia's house, he was arrested. Tapia never received the $25 defendant took from him.

¶ 14    On cross-examination, Tapia acknowledged that defendant had never demanded money from him or showed him a gun. While Tapia's phone was not charged when defendant called him, it recorded defendant's phone number, which appeared once the phone was charged. Defendant spoke to Tapia in an "aggressive" manner when he told him to "relax."

¶ 15    The court itself questioned Tapia extensively concerning the timeline of events. During this examination, Tapia stated that when defendant first asked him for a ride, "[h]e was actually nice" and was "asking [Tapia] politely." Once parked at the first location, Tapia watched two videos on defendant's phone then told him that he needed to go, at which point defendant became aggressive and told him "if [Tapia] did anything that [defendant] would have his friends over in a heart beat." Defendant had informed Tapia that he always carried a "45" with him. When Tapia gave defendant his wallet with the $25, defendant looked through it and threw it on the dashboard, telling Tapia that he was not "trying to rob" him but also that the amount in the wallet was "not enough" and he could not buy anything with it. Tapia took his wallet and money back after defendant threw it on the dashboard. After Tapia failed to withdraw money from the ATM and returned to the car empty handed, defendant was "mad" and accused Tapia of "messing with him." Once at home, Tapia charged his cell phone, at which point defendant's number appeared on his phone as a missed call.

¶ 16    On redirect examination, Tapia confirmed that, when he arrived at his house and got out of the car, he left the $25 from his wallet on the dashboard of the car, and defendant "finally" took the money.

¶ 17    Carlos Guzman testified that he was Tapia's neighbor living across the street at the time of the incident. That night, Guzman heard a person, whom he identified in court as defendant, screaming and banging on windows. Guzman went outside his home and defendant walked up to him and asked if "Jose" or any "Latinos" lived in "that house." Guzman told defendant he did not know, even though he did know where Tapia lived. Defendant then asked Guzman for a ride, but Guzman told him he did not have a car.

¶ 18    Chicago police officer Alexander Roman testified that he responded to Tapia's call and took his statement.[1] After he learned Tapia had defendant's phone number, Roman and his partner asked if Tapia was comfortable sending defendant a message "that we have money to come back to that address." Tapia sent the text message and the officers asked Tapia to contact them if defendant returned. When he did, the officers informed other officers in an unmarked police car who arrested defendant. Roman returned to the scene and saw defendant in custody. Roman was present during the search of defendant, and saw a white face mask and a black foam object wrapped in tape in the shape of a "pistol" or "weapon" removed from inside defendant's coat.

¶ 19    Officer Colon testified that, while on patrol in an unmarked car, Roman reported that a robbery had taken place in the area, and the offender would return to the location to receive money from the victim again.[2] Colon parked nearby and saw defendant arrive in a van, at which point the officers arrested him. Defendant did not comply with the officers, and tossed something in his mouth as they grabbed his arms. Colon searched defendant and found a plastic face mask and "black piece of foam taped with *** electrical tape in the shape of what appeared to be a handgun" inside his coat. The foam and the face mask were admitted into evidence.

¶ 20    The court granted defendant's motion for a directed verdict with respect to the two kidnapping counts, but denied it for the remaining counts.

---

[1] In the report of proceedings, during Roman's testimony, he stated his name was "Roman Alexander from 002 District." However, his name appears as "A J Roman" and "Alexander Roman" in Mayorga's arrest report and property inventory sheet, and is referred to exclusively as Officer Roman by the state's attorney.

[2] Officer Colon does not give his or her full name on the record.

¶ 21 Defendant testified that he was eating at Positanos on November 22, 2013, where he saw Tapia, whom he knew "[f]rom the neighborhood." They spoke for a bit, while Tapia purchased his pizza and defendant finished eating. After Tapia got his food, he offered defendant a ride home. Defendant did not have a weapon.

¶ 22 In the car, defendant and Tapia continued to talk and defendant mentioned that Tapia owed him money, because he had "fronted him an ounce of cocaine" worth approximately $1300. Tapia offered to take defendant to the ATM at the Chase Bank so that Tapia could withdraw "a few hundred" for defendant and owe him the rest.

¶ 23 Tapia tried multiple times to withdraw money from the ATM, but was unable to withdraw any money from his account. He suggested taking defendant to any store to "buy anything [defendant] want[ed]." Defendant said he did not want to do that, so Tapia told him that he had money at his house. Tapia drove defendant to his house and asked him to wait in the car. When Tapia returned, he offered defendant $40, but defendant refused, saying that he needed more money. Tapia took his pizzas inside and did not return.

¶ 24 After Tapia went inside the second time, defendant called and texted him, but Tapia did not answer. Defendant then got out of the car and started yelling for "Jose." Defendant saw a man across the street and asked him if he knew Jose, which the man denied. He waited for at least 30 minutes before walking home. At home, defendant received a text message from Tapia, asking if defendant "still want[ed] to come pick up the money" because Tapia did not want defendant "causing any problems" with his family."

¶ 25    Defendant returned to Tapia's house where he was arrested. He had been holding cocaine in his hand to bring to Tapia, and put it in his mouth as he was being arrested. Defendant acknowledged he had several prior convictions.

¶ 26    On cross-examination, defendant stated he "fronted" Tapia the ounce of cocaine in June 2013, and Tapia was supposed to pay back defendant within two months. Defendant did not see Tapia for months, because Tapia had been "ducking and dodging" him. Although he knew where Tapia lived, defendant never went to his house to get his money, because Tapia "didn't want his family to know that he was dealing drugs." Defendant never went to his house because he "respect[ed] the house." While defendant was "upset" about the situation, he never threatened Tapia or told him about his "connections" in the neighborhood or that he "did 15 years for a double homicide." Defendant denied that police recovered the mask and the foam object from his jacket, and stated that he had never seen them before.

¶ 27    At the police station, defendant spoke with Detective Verta and his partner. Defendant denied telling Verta that he lied to Tapia about serving a 15-year sentence for double homicide. Defendant also denied telling Verta that he possessed the foam object because "La Raza (phonetic) gang members did not want [him] in the area any more." Defendant denied taking any money from Tapia, and denied telling Verta that he spent the 25 dollars on food for his family. Defendant stated that he "never told the detective nothing."

¶ 28    The State called Detective Ray Verta as a rebuttal witness. Verta testified that he and his partner, Detective Lou Otero, interviewed defendant at the 9th district police station. Defendant admitted to Verta that he had lied to the victim by telling him that he had "done 15 years for a double homicide." Defendant also told Verta that he had taken $25 from Tapia and asked Tapia

for more money; defendant used the $25 to buy food for his family. When Verta asked defendant about the foam object in his pocket, defendant told Verta he was carrying it "because the La Raza gang members no longer wanted him in the neighborhood."

¶ 29    On cross-examination, Verta acknowledged that he "knew of" defendant before November 23, 2013, because he was "the subject of numerous robbery investigations prior to that." Verta stated defendant told him he continued asking Tapia for more money because he wanted to feed his family.

¶ 30    For impeachment purposes, the State submitted certified copies of defendant's prior convictions for armed robbery, aggravated robbery, felony theft, and possession of cannabis in a penal institution.

¶ 31    The trial court found defendant guilty of vehicular invasion, aggravated robbery, and intimidation. In ruling, the court emphasized its own questioning of Tapia, which it did to clarify Tapia's account of the incident. The court also noted that defendant chose to testify and, in doing so, placed his credibility at issue. The court described the case as "unusual" but had "no doubt in [its] mind that defendant worked his way in Mr. Tapia's car" and would not "take no for an answer." The court did not believe the men had previously known one another, or that the case concerned an "old drug debt." The court found that once defendant was in his car, Tapia was unable to remove him, and defendant intimidated him "by design."

¶ 32    The court did not find it relevant that defendant told Tapia he was not being robbed, because defendant positioned himself with his hand in his pocket in the car and told Tapia that he was dangerous and always carried a gun. The court believed defendant had the "taped up piece of foam" in his pocket in order to make Tapia believe he was armed, and Tapia in fact thought

defendant was armed. Defendant told Tapia that $25 was not enough to get him out of the car and refused to get out until Tapia "complied with that request." The court noted Tapia had defendant's phone number because defendant called him. The court considered Tapia's testimony, including its own examination of him, and was "convinced" that he was truthful in his testimony. The court also had "no doubt" defendant was impeached by Verta's testimony regarding his interview at the police station.

¶ 33 The court granted defendant's motion for reconsideration with respect to the unlawful vehicular invasion count vacating that count, and denied the motion with respect to the aggravated robbery and intimidation counts. The court sentenced defendant to concurrent sentences of 12 years (aggravated robbery) and 5 years (intimidation) in prison. The court denied defendant's motion to reconsider sentence.

¶ 34 Defendant argues on appeal that his convictions should be reversed because the State failed to prove beyond a reasonable doubt that he robbed and intimidated Tapia, where Tapia's version of events was incredible, and any intimidation which may have occurred would have been intended by defendant to facilitate a robbery rather than cause Tapia drive him to a location as charged. Second, defendant argues his intimidation conviction violates the one-act, one-crime rule and should have been merged with his robbery conviction.

¶ 35 The standard of review in challenging the sufficiency of the evidence is "whether, viewing the evidence in the light most favorable to the State, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Belknap*, 2014 IL 117094, ¶ 67 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The trier of fact, here the trial judge, has the responsibility to resolve conflicts in the testimony, weigh the evidence,

and draw reasonable inferences from basic facts to ultimate facts. *People v. Brown*, 2013 IL 114196, ¶ 48. Accordingly, this court will not retry the evidence or substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or credibility of witnesses. *Id*. A reviewing court will not reverse a criminal conviction unless the evidence is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). For the following reasons, we find the evidence sufficient to support defendant's convictions.

¶ 36    To prove defendant guilty of aggravated robbery as charged, the State had to prove defendant knowingly took property from the person or presence of Tapia by the use of force or by threatening the imminent use of force, while indicating verbally or by his actions to Tapia that he was armed with a firearm or other dangerous weapon. 720 ILCS 5/18-1(a),(b)(1) (West 2012). A conviction for aggravated robbery is appropriate even if "it is later determined that [defendant] had no firearm" in his possession during his commission of the robbery. 720 ILCS 5/18-1(b)(1) (West 2012).

¶ 37    Viewing the evidence in a light most favorable to the State, we find a rational trier of fact could find beyond a reasonable doubt that defendant took $25 from Tapia by threatening the imminent use of force and indicating to him that he was armed with a firearm. Tapia testified that, throughout defendant's time in the car, he purposely faced Tapia, pointing an object in his pocket in the direction of Tapia. He told Tapia he always carried a gun, and Tapia thought the object in defendant's pocket was a gun. Defendant refused to leave Tapia's car, spoke "aggressively" to Tapia, and informed him he knew the gang members in the neighborhood, and told Tapia "his boys" would surround Tapia at the snap of defendant's fingers, implying they

would hurt Tapia if he did not do what defendant wanted. Despite repeatedly telling Tapia he was not being robbed, defendant spoke extensively about needing money, told Tapia $25 was not enough, refused to leave Tapia's car, repeatedly forced Tapia back into the car, and acquiesced to Tapia's suggestion that more money be obtained from the ATM or, later, Tapia's home. Then, at his house, Tapia left the $25 from his wallet on the dashboard, and defendant later took that money. Upon defendant's arrest, Officer Colon searched defendant and found a foam and tape wrapped object in the shape of a "handgun," which the trial court reasonably inferred defendant had in his pocket in order to make Tapia believe he was armed. The testimony of a single witness, if positive and credible, is sufficient to convict, even if contradicted by defendant. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Accordingly, Tapia's credible testimony is sufficient to convict defendant.

¶ 38 Defendant argues Tapia's testimony was incredible and the State's other evidence was insufficient to prove him guilty of armed robbery. He emphasizes inconsistencies in Tapia's testimony, in particular regarding when defendant took the $25 from Tapia. Defendant also argues the circumstantial evidence supports his testimony that he and Tapia knew each other before the incident because defendant was Tapia's drug dealer, and attacks Tapia's credibility for his testimony that they were strangers. Defendant contends Tapia's testimony "made little sense" regarding his actions during the incident, and emphasizes that defendant's version of events, that he was collecting a drug debt, was the more believable account, especially as Tapia had defendant's phone number and defendant was bringing cocaine to Tapia when he responded to Tapia's text. Further, defendant argues neither the exhibits nor the detective's testimony that defendant admitted to taking the money from Tapia proved his guilt.

¶ 39    Defendant's contentions are nothing more than a request to this court to reweigh the evidence, resolve conflicts in the testimony, and determine the credibility of the witnesses. As the reviewing court, we refuse to do so. The trial court heard essentially the same arguments made in defendant's closing, that defendant and Tapia knew one another and Tapia owed defendant money, and nevertheless found Tapia credible and defendant incredible. The trial court extensively questioned Tapia itself in order to understand the timeline of events and clarify his account. It considered the inconsistencies in Tapia's testimony, ultimately finding him credible. The trial court also found defendant was impeached by Verta's rebuttal testimony. In ruling, the court noted that this case was "unusual," but was "convinced" Tapia's account was truthful, and specifically noted Tapia accounted for the reason he possessed defendant's phone number. Further, we find the trial court's finding that defendant pointed the foam handgun to make Tapia believe he had a gun to be a reasonable inference from the facts. We will not substitute our judgment for that of the trial court's regarding Tapia's and defendant's credibility, any inconsistencies in the testimony, or inferences drawn from the facts. See *Brown*, 2013 IL 114196, ¶ 48. Accordingly, defendant's conviction for armed robbery is not so unreasonable or improbable as to create a reasonable doubt of his guilt (*Jackson*, 232 Ill. 2d at 281), and we affirm the conviction.

¶ 40    We also affirm defendant's conviction for intimidation. In order to prove defendant guilty of intimidation as charged, the State needed to prove defendant directly "by any means" communicated to Tapia a threat to inflict physical harm upon Tapia, with the intent to cause Tapia to "drive [him] to a location." 720 ILCS 5/12-6(a)(1) (West 2012). Intimidation is a specific intent crime, and the intent which must be proven is not the intent to carry out the threat

but rather the intent to cause another person to perform a specific act. *People v. Byrd*, 285 Ill. App. 3d 641, 647-48 (1996). Intent may be deduced by the trier of fact from the facts and circumstances surrounding the offense. *Id*. at 647. "The purpose of the intimidation statute is to prohibit the making of specified threats intended to compel a person to act against the person's will, and the gravamen of the offense of intimidation is the exercise of improper influence, the making of a threat with the intent to coerce another." *People v. Maldonado*, 247 Ill. App. 3d 149, 153 (1993). As used in the statute, threat requires "that the expression in its context have a reasonable tendency to create apprehension that its originator will act according to its tenor." *Id*. at 153-154. Intimidation requires proof of a threat of physical harm, possibly in the future, but the means or method which the threat is communicated is not an essential element of the offense. *People v. Casciaro*, 2015 IL App (2d) 131291, ¶ 85.

¶ 41　　The issue here is not whether defendant's alleged threats (his telling Tapia about his friends in the neighborhood, prior murder convictions, and always carrying a gun, as well as pointing a gun shaped object at Tapia) were intended to coerce or create apprehension, as defendant does not dispute these acts had a reasonable tendency to coerce Tapia or cause him apprehension. Instead, defendant argues that the State failed to prove he committed intimidation as charged because, even if he did threaten Tapia in such a way, the evidence does not support that he solicited a ride by threat, but rather only intimidated Tapia into taking his money. Defendant argues that he merely "conned his way into the car" in order to procure a ride, which does not satisfy the elements of intimidation.

¶ 42　　Viewing the evidence in a light most favorable to the State, we believe a rational trier of fact could have found the essential elements of intimidation beyond a reasonable doubt. Initially,

we note defendant procured the first car ride from the pizzeria to his friend's house not under any threat of physical harm, even though, as the court found, he would not "take no for an answer." Tapia testified defendant was polite and "actually nice," when he asked for a ride from the pizzeria. At that stage, we agree with defendant that he arguably had not yet committed intimidation. Regardless, as soon as Tapia was confined in the car with defendant, defendant became increasingly threatening, telling Tapia defendant was a "bad mother*****," had been in prison for a double homicide, and knew gang members. As the car was parked in front of defendant's first destination, he specifically told Tapia "if he wanted to do something stupid that he had his boys like a sound of a whistle or a snap of his fingers, [Tapia] would be surrounded by them." During the drive to the initial location, defendant told Tapia he always carried a gun.

¶ 43    After being parked in the first location for 5 to 10 minutes and defendant indirectly threatening Tapia, Tapia got out of the car. He wanted to run because he "feared for his life." Defendant refused to leave Tapia's car, and insisted Tapia return to the car, and drive him to his "girl's" house, all while facing Tapia with the presumed gun pointed at Tapia. Tapia did not want to drive defendant anywhere but acquiesced because he was scared. Considering the facts and circumstances of this case, we find it a reasonable inference that defendant, in order to coerce Tapia to drive him to what he claimed was his girlfriend's house, made an implied threat to Tapia that he would either shoot him or call gang members to "surround" him. See *Byrd*, 285 Ill. App. 3d at 647-48 (the specific intent at issue in intimidation is the threat to coerce, to force someone to act or not act). Intent to coerce may be inferred from the defendant's statement and surrounding circumstances. *Casciaro*, 2015 IL App (2d) 131291, ¶ 84. Even if defendant did initially "con" his way into Tapia's car without threat to secure a ride, his behavior became

- 16 -

increasingly threatening during the drive and at the initial location, threatening Tapia into giving him a ride to his girlfriend's house. The criminal objective of intimidation, coercing Tapia to drive him to another location, only changed to aggravated robbery when defendant pressured Tapia to provide him with more money. We cannot say that defendant's conviction for intimidation is so unreasonable or improbable as to create a reasonable doubt of his guilt. See *Jackson*, 232 Ill. 2d at 281. Accordingly, we affirm defendant's intimidation conviction.

¶ 44    Lastly, defendant contends that his intimidation conviction violates the one-act, one-crime rule because any intimidation which happened amounted to the same threat used to support defendant's robbery conviction.

¶ 45    As an initial matter, defendant acknowledges he did not object at trial or raise this claim in any post-trial motion and, therefore, has forfeited review of this issue. See *People v. Hillier*, 237 Ill. 2d 539, 544-45 (2010) (holding that to preserve claims for appeal and avoid forfeiture, a defendant must make both a contemporaneous objection and file a written postsentencing motion raising the issue). Regardless, the plain error doctrine allows a reviewing court to consider an unpreserved error if a clear and obvious error occurred and (1) the evidence is so closely balanced that the error threatened to tip the scales of justice against the defendant or (2) the error is so serious that it deprived the defendant of a fair trial and challenged the integrity of the judicial process. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Reviewing courts review one-act, one-crime violations under the second prong of the plain error doctrine as an obvious error so serious that it challenges the integrity of the judicial process. *People v. Coats*, 2018 IL 121926, ¶ 9. Accordingly, we will address defendant's argument under the second prong of the

plain error doctrine, and must first consider whether a one-act, one-crime error occurred. *Id*. ,¶¶ 10-11.

¶ 46 Under the one-act, one-crime rule, a defendant may not be convicted for multiple offenses that are based on precisely the same physical act. *Coats*, 2018 IL 121926, ¶ 11. In order to make this determination, the court follows a two step analysis: (1) ascertain whether the defendant's conduct consisted of a single physical act or separate acts; and (2) if the defendant committed multiple acts, ascertain whether any of the offenses are lesser-included offenses. *Id*. at ¶ 12. If none of the offenses are lesser-included offenses, then multiple convictions are proper. *Id.* Whether a violation of the rule has occurred is a question of law that is reviewed *de novo*. *People v. Smith*, 2019 IL 123901, ¶ 15.

¶ 47 Here, defendant argues the State's charges, argument, and evidence did not differentiate between the threat of imminent force used for the aggravated robbery and the threat to inflict physical harm used for the intimidation, and the alleged intimidation amounted to the threat used to support defendant's robbery conviction. Defendant contends threatening to inflict physical harm (intimidation) is threatening to use force (aggravated robbery) and the State charged only a single course of conduct. He argues that, because the evidence only showed he threatened Tapia with violence, there was only a single offense and the lesser offense, intimidation, should be vacated.

¶ 48 First, we must determine whether the conduct by which defendant committed the offenses consisted of "precisely the same physical act" as opposed to multiple physical acts. See *Coats*, 2018 IL 121926, ¶ 11. An "act" is defined "for purposes of this analysis [as] 'any overt or outward manifestation which will support a different offense.' " *Smith*, 2019 IL 123901, ¶ 18

(quoting *People v. King,* 66 Ill. 2d 551, 566 (1977)). A person may be guilty of two offenses when a common act is part of both offenses or part of one offense and the only act of the other offense. *Coats*, 2018 IL 121926, ¶ 15 (despite common act of possession of a handgun which served as the basis for defendant's armed habitual criminal and armed violence convictions, the Supreme Court found two physical acts because the armed violence conviction involved an additional, separate act, possession of drugs); *People v. Rodriguez*, 169 Ill. 2d 183, 187 (1996) (as long as there are multiple physical acts, "their interrelationship does not preclude multiple convictions") (quoting *People v. Myers*, 85 Ill. 2d 281, 288 (1981)).

¶ 49    In order to commit intimidation, defendant must have: (1) communicated a threat of physical harm on a person; (2) with intent to cause that person to perform any act. See 720 ILCS 5/12-6(a)(1) (West 2012). In order to commit aggravated robbery, defendant must have: (1) knowingly taken property from the person or presence of another; (2) by the use of force or by threatening the imminent use of force; (3) while indicating by his actions that he is armed with a firearm. See 720 ILCS 5/18-1(b)(1) (West 2012).  Both intimidation and aggravated robbery share the common act of communicating a threat of imminent force or harm. However, aggravated robbery contains the additional act of indicating to the victim that defendant is armed with a firearm. Further, as charged, the aggravated robbery count contains the additional act of taking Tapia's property under the threat of imminent force, while the intimidation count contains the additional act of forcing Tapia to drive defendant somewhere. While the two offenses share the common "threat" act, we find they were not carved from precisely the same physical act. Accordingly, the conduct comprising intimidation and aggravated robbery does not consist of precisely the same physical act; rather, the conduct consists of multiple physical acts.

¶ 50    Under the second step in the one-act, one-crime analysis, the court determines whether any of the offenses are lesser-included ones and, if no offenses are lesser-included offenses, multiple convictions are appropriate. *Coats*, 2018 IL 121926, ¶ 12. When the issue of lesser-included offenses arises in the context of a one-act, one-crime issue, we apply the abstract elements approach. *Id.* at ¶ 30. Under the abstract elements approach, "[i]f all of the elements of one offense are included within a second offense and the first offense contains no element not included in the second offense, the first offense is deemed a lesser-included offense of the second." *People v. Miller*, 238 Ill. 2d 161, 166 (2010).

¶ 51    Defendant claims intimidation is a lesser included offense of aggravated robbery. It is not. Intimidation is a specific intent crime, requiring the specific intent to cause another to perform or omit the performance of certain acts. *People v. Smith*, 78 Ill. 2d 298, 306 (1980). It is therefore not a lesser-included offense of aggravated robbery. *Id.* ("Specific intent is not, however, an element of robbery. *** Intimidation is not, therefore, a lesser included offense of robbery, for it requires proof of an element that is not required for the offense of robbery"). Because intimidation is not a lesser-included offense of aggravated robbery, the separate convictions for aggravated robbery and intimidation are appropriate. *Coats*, 2018 IL 121926, ¶ 12.

¶ 52    In sum, we conclude that defendant's convictions were proper under the one-act, one-crime rule. Having found no error, there can be no plain error. See *People v. Naylor*, 229 Ill. 2d 584, 593 (2008).

¶ 53    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 54    Affirmed.