THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CORNELL BYRD, Defendant-Appellant.

First District (5th Division)   No. 1—95—2624

Opinion filed November 22, 1996.

David A. Cuomo, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Steven L. Klawans, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

Following a bench trial, defendant, Cornell Byrd, was convicted of two counts of intimidation for communicating threats to Chicago police sergeant David O'Callahan and Chicago police officer Martin Rios. The trial judge sentenced Byrd to an extended term of 10 years' imprisonment. On appeal, Byrd argues that: (1) the State failed to prove beyond a reasonable doubt that he had the specific intent to

cause another to perform or omit the performance of any act; (2) evidence that he was reputed to be a high ranking member of the El-Rukn street gang, in which he disciplined fellow gang members and supervised a network of narcotics traffickers, was not relevant to any of the issues litigated at trial and was prejudicial; (3) he was denied his sixth amendment right to effective assistance of counsel because trial counsel failed to offer evidence that he did not belong to the El-Rukn street gang in January of 1994 (the month of his arrest on these charges), and because trial counsel failed to offer substantial evidence of witness O'Callahan's bias and hostility towards him; and (4) the trial court abused its sentencing discretion by imposing the maximum sentence, by making his sentence run consecutive to a federal sentence under which he was not serving time at the time of his sentencing hearing, and by refusing to give him credit for time served while in custody prior to trial.

We affirm.

## BACKGROUND

At about 4 a.m. on January 17, 1994, Chicago police officers Jeffrey Johnson and Eileen Little parked their marked squad car near The Godfather Lounge on 87th and Harper in Chicago. While parked near the lounge, a person approached the car and told the officers that a person inside the lounge had a gun. A short time later, defendant exited the lounge with three other individuals and the person identified defendant as the person with the gun. Defendant and his companions entered a Jeep vehicle and began driving westbound on 87th. Another vehicle, a white Jeep, followed Byrd's vehicle.

The officers followed the defendant and curbed Byrd's vehicle at 87th and Dante. The white Jeep that had been following Byrd passed the officers and pulled over a quarter of a block ahead of the officers. Defendant exited the vehicle and Officer Johnson asked him for his driver's license. Defendant said, "What are you fucking with me?" Officer Johnson told defendant that he just wanted to see his license. Byrd gave the officer his license. Officer Johnson thought the license appeared to be fraudulent because the number and letter sequence in the driver's license number were in reverse order. The officer then asked Officer Little to run a name check on the license. After receiving information from the communications center, Officer Johnson told Byrd that he was under arrest for carrying a fraudulent driver's license. Sergeant O'Callahan overheard Officer Little's radio transmissions and proceeded to the scene.

The officers then instructed the other passengers to get out of the car so they could conduct a protective search. Assist cars and

Sergeant O'Callahan then arrived on the scene. At this time, the white Jeep that had been following Byrd drove away. When Sergeant O'Callahan arrived, Byrd began to yell at the officers. He called the officers "a bunch of pussy motherfuckers" and claimed he was "tired of being fucked with." He told the officers that he knew Sergeant O'Callahan and that the sergeant used to be a commander but was demoted to the rank of sergeant because of him (Byrd) and the El-Rukns. Furthermore, Byrd told Sergeant O'Callahan that his men were willing to die for him and, if he gave the order, they would bust O'Callahan in the mouth and take the rap for it. He also told the sergeant, "Look, Johnny Fort and them were behind, you missed it all, we just dropped off a couple of kilos and if I wanted to I could have all of you all shot." Sergeant O'Callahan told Byrd that the officers did not need "all this showboating." Then the sergeant put Byrd in the back of a squad car.

Byrd was then transported to the fourth district police station and placed in an interview room with Charles Adams, one of the other passengers who had been arrested. One of Byrd's hands was handcuffed to a wall. Officer Little stayed in the interview room for some period of time to prepare the arrest report and other paperwork. Officer Johnson was in and out of the room periodically. Officer Johnson, Officer Little, and Sergeant O'Callahan all testified that Officer Rios was also present in the interview room as well. Sergeant O'Callahan entered the room to supervise the arrest procedures. At that time, Byrd said to Sergeant O'Callahan:

> "Come a little closer. Why don't you step a little closer. I'll give you a real case, come a little closer so I can smack the shit out of you. I'm going to knock you on your ass and hit you in your head ***."

Officer Johnson and Officer Little testified that they did not hear Byrd say to them or to Sergeant O'Callahan that he was going to hurt or kick someone if they did not let him go, but that Byrd did say to Sergeant O'Callahan, "I'll get you later on, don't worry about it." At this point, Officer Little left the interview room to write up the charges of intimidation. Byrd then said to Sergeant O'Callahan:

> "Oh you're not going to be arresting me or anybody else. Look, you ain't going to be arresting nobody. We'll be dealing drugs anytime we want and I'll shoot you in the head *** and I'll not put a cluster in your head."

Byrd then pointed at Officer Martin Rios and continued:

> "You see that bulletproof vest? We teach our men to shoot above that bulletproof vest, and when we do it we don't put a cluster in your head, put one neat hole between your eyes so you guys will

be eating worms in your graves *** I'm going to shoot you right between the eyes."

O'Callahan left the room but later returned. At that time, Byrd said: "You know I'm a general. Look, you don't think I could have you killed? If I order this man here to kill you he'll do it. [Byrd turned to Adams] If I order you [referring to Adams] to shoot this man in the head or shoot these guys in the head, you have to do it, isn't that correct?"

Adams responded "Yes I would."

O'Callahan left and returned with Lieutenant Boreczky. O'Callahan introduced Boreczky. Byrd told Boreczky, "I'll kick your ass too," and repeated a statement he had previously made: "If you continue to fuck with me and try to arrest me I will kill you or I will have my men kill you, they will shoot you in the head." At the bench trial, Adams testified that Byrd and O'Callahan had a shouting match but that Byrd did not say he would shoot O'Callahan or make arrangements for him to be shot.

Lieutenant Boreczky contacted Assistant State's Attorney Rabinovitz, who was assigned to felony review at the time. ASA Rabinovitz did not bring charges and the lieutenant made an override of that decision. Later, however, Mary Kay Moore, an assistant State's Attorney assigned to the gang unit, concurred in the override of the charges.

The trial court found defendant guilty of both counts of intimidation. During post-trial matters, defendant was arrested by federal marshalls and imprisoned. At the sentencing hearing, it was revealed that, in 1988, defendant was convicted in federal court of conspiracy to defraud the United States government and arson. He was released on parole from federal prison on August 17, 1989. The judge sentenced Byrd to 10 years' imprisonment to be served consecutively to the federal conviction.

We affirm.

OPINION

I

Byrd first contends that the State failed to prove beyond a reasonable doubt that Byrd had the specific intent to cause another to perform or to omit the performance of any act and, therefore, failed to establish that Byrd committed the crime of intimidation. If, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found each element of intimidation beyond a reasonable doubt, we must affirm defendant's conviction. *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985).

■ The trial court found defendant guilty of intimidation. The pertinent portions of the intimidation statute state:

"(a) A person commits intimidation when, with intent to cause another to perform or to omit the performance of any act, he communicates to another, whether in person, by telephone or by mail, a threat to perform without lawful authority any of the following acts:

(1) Inflict physical harm on the person threatened or any other person or on property." 720 ILCS 5/12—6(a)(1) (West 1994).

The purpose of the intimidation statute is to prohibit the making of specified threats intended to compel a person to act against the person's will, and the gravamen of the offense of intimidation is the exercise of improper influence, the making of a threat with the intent to coerce another. *People v. Maldonado*, 247 Ill. App. 3d 149, 153, 617 N.E.2d 236 (1993), citing *People v. Tennin*, 162 Ill. App. 3d 520, 525, 515 N.E.2d 1056 (1987). Implicit in the word "threat" as it is used in the intimidation statute is the requirement that the expression, in its context, has a reasonable tendency to create apprehension that its originator will act according to its tenor. *People v. Maldonado*, 247 Ill. App. 3d at 153-54, quoting *People v. Gallo*, 54 Ill. 2d 343, 352, 297 N.E.2d 569 (1973). Intimidation is a specific intent crime. *People v. Haybron*, 153 Ill. App. 3d 906, 908, 506 N.E.2d 369 (1987). Intent may be deduced by the trier of fact from the facts and circumstances surrounding the offense. *People v. McKendrick*, 138 Ill. App. 3d 1018, 1028, 486 N.E.2d 1297 (1985). We believe the State has sustained its burden of establishing that defendant possessed the specific intent to intimidate Sergeant O'Callahan and Officer Rios.

■ Defendant raises three points to support his claim that he was not proven guilty beyond a reasonable doubt. First, Byrd argues that no argument can be made that he was trying to coerce Sergeant O'Callahan and Officer Rios to release him on the fraudulent driver's license charges because Officers Johnson and Little had already arrested him for this charge before O'Callahan and Rios arrived at the scene at 87th and Harper. Second, defendant argues that in those cases in which intimidation charges have been upheld, defendants referred to specific conduct they wished the victims not to take. Defendant maintains that no such references or conditions can be found in any of the statements he is alleged to have made to O'Callahan and Rios. Third, Byrd argues that the State's claim that he threatened the officers so they would not investigate him in the future must fail because no specific investigation was being conducted against him at that time.

We disagree with defendant's contentions and find *People v. Mc-Kendrick* instructive of this issue. In *McKendrick*, the defendant attempted to prevent complainant from testifying against him by threatening her with physical harm. He told her that he had been in jail for three weeks and that she "had done this to him." *McKendrick*, 138 Ill. App. 3d at 1028. Defendant raped complainant and told her that she should not "go through with this" and that he would leave her alone if she would "just stop this whole thing." *McKendrick*, 138 Ill. App. 3d at 1028. The appellate court held that the trial court properly inferred an intent to prevent complainant from testifying about the pending charges from defendant's words and actions and the surrounding circumstances, despite defendant's lack of specificity of what act he wished complainant to perform or omit.

In the instant case, defendant told the police officers, *inter alia*, that he would have his men shoot the officers if they *continued* to try and arrest him and mess with him. Defendant's statements to Sergeant O'Callahan and Officer Rios must be viewed in their context. The trial judge heard this testimony and viewed the demeanor of the witnesses. She decided the State had met its burden of proof beyond a reasonable doubt and we agree.

## II

■ Defendant also contends that evidence that he was reputed to be a high ranking member of the El-Rukn street gang, for which he disciplined fellow gang members and supervised a network of narcotics traffickers, was not relevant to any of the issues litigated at trial and was prejudicial. Specifically, he complains of Sergeant O'Callahan's testimony relative to the history and organization of the El-Rukn street gang and Byrd's specific function in the gang as a general. Defendant contends that this evidence was relevant to neither the officer's perception of the alleged threats nor the accused's ability to carry out the alleged threats because neither matter is an element of the offense of intimidation. In response, the State argues that such evidence was relevant in determining whether defendant's statements reasonably tended to create apprehension that defendant would carry out his threats.

The intent which must be proven by the State in an intimidation case is not the intent to carry out a threat but the intent to "cause another *** to omit the performance of any act." *People v. Bergin*, 227 Ill. App. 3d 32, 47, 590 N.E.2d 939 (1992). Therefore, the issue in this case is whether the defendant's words had a reasonable tendency, under the circumstances, to place the officers in fear that the defendant would perform his threatened act. *People v. Verkruysse*,

261 Ill. App. 3d 972, 975, 639 N.E.2d 881 (1994). Here, evidence of defendant's gang affiliation was not offered to show whether Byrd actually would carry out his threats. See *Bergin*, 227 Ill. App. 3d at 46 (court held that proof of intimidation was not undercut by the unlikelihood that defendant would have harmed the victim's children due to his good relationship with the children). Rather, the evidence was relevant to and probative of defendant's intent. See *People v. Jones*, 161 Ill. App. 3d 688, 698, 515 N.E.2d 166 (1987). The evidence explained why he threatened the officers in the way that he did and why those threats from this particular defendant, whom the officers knew had been a member of the El-Rukns, had a reasonable tendency, under the circumstances, to place the officers in fear that defendant would shoot them in the head if they did not act accordingly.

We agree with the State that evidence about the El-Rukns' history of violence and Byrd's role in the El-Rukns supported the assertion that defendant's threats to shoot the officers in the head created the apprehension that Byrd would act according to his threats. Therefore, defendant's gang membership was inextricably related to the charges against him and was properly admitted at trial.

■ Regardless of whether the evidence was properly admitted, defendant has failed to show that such admittance was prejudicial. Defendant has not established that the trial court relied upon O'Callahan's statements about the El-Rukn gang in finding defendant guilty, or that the trial judge failed to consider only competent evidence against the defendant. We must presume that the trial court considered only competent evidence unless the contrary affirmatively appears of record. *People v. Schmitt*, 131 Ill. 2d 128, 138-39, 545 N.E.2d 665 (1989). Based upon training and experience, a trial judge, acting as a trier of fact, is generally believed to have a superior ability to restrict the use of improper evidence and to consider only competent evidence. *People v. Crossley*, 236 Ill. App. 3d 207, 218, 603 N.E.2d 575 (1992). Defendant points out that, initially, the trial court overruled defendant's objections to testimony regarding defendant's connection with the El-Rukns, but then later sustained an objection after asking the State to explain the testimony's relevance. There is nothing in the record to indicate that the trial court relied upon those statements that were found to be irrelevant. In finding defendant guilty, the judge made no reference to the gang activity. To the contrary, the court acknowledged the evidentiary problem presented by the testimony and assured the defendant that it would ignore the evidence. During the latter part of O'Callahan's testimony, defense counsel objected when O'Callahan

testified about his knowledge of defendant's role and reputation in the El-Rukns. The judge responded, "It's not relevant, but there's no jury present. I will just ignore it. Okay." Consequently, we hold that defendant has not established that he was prejudiced by this evidence.

### III

Defendant further argues that his conviction should be reversed because he was denied his sixth amendment right to effective assistance of counsel where trial counsel failed to offer evidence that he did not belong to the El-Rukn street gang at the time of the incident at issue, as he had separated from the gang in 1981. Defendant also argues that he was denied effective assistance of counsel where trial counsel failed to offer evidence of O'Callahan's bias and hostility toward the defendant. He urges that such evidence would have been classic proof of prejudice on O'Callahan's part and would have, if used, cast considerable doubt on O'Callahan's credibility.

■ A two-part test of effective assistance of counsel was adopted by the Illinois Supreme Court in *People v. Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984). Under this test, a defendant must establish that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, were it not for counsel's unprofessional errors, the result of the proceeding would have been different. *Albanese*, 104 Ill. 2d at 525. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Albanese*, 104 Ill. 2d at 525. Furthermore, the deficiency in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance. *People v. Whitehead*, 169 Ill. 2d 355, 380, 662 N.E.2d 1317 (1996).

■ A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies, if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice. *Albanese*, 104 Ill. 2d at 525. Determining the prejudice component of this analysis entails more than applying an outcome-determinative test. The defendant must show that counsel's performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *Whitehead*, 169 Ill. 2d at 381, citing *People v. Mahaffey*, 165 Ill. 2d 445, 458, 651 N.E.2d 174 (1995). Resolution of such claims based only on the prejudice component involves looking at the findings unaffected by error on remaining findings and answering, in the end, whether it was reasonably likely that the decision would have been different. *Whitehead*, 169 Ill. 2d at 381. Under this analysis, we

do not find the conduct of Byrd's trial counsel to be ineffective. Our review of the record demonstrates that assuming, *arguendo*, that all of the alleged errors constituted ineffective representation, these errors would not have altered the result in this case. Therefore, there is no need to review the individual claims of inadequate representation to determine whether counsel acted within the range of reasonable professional assistance. Even if defendant's trial counsel had offered evidence of Byrd's separation from the El-Rukns, or O'Callahan's bias toward Byrd, it is reasonably likely that defendant would still have been found ·guilty beyond a reasonable doubt. On three separate occasions, defendant told the officers that he would shoot them. These statements were heard by several witnesses. We therefore conclude that trial counsel's failure to offer evidence of Byrd's separation from the El-Rukns and O'Callahan's bias toward Byrd had no prejudicial effect on defendant's defense.

## IV

Byrd also contends that the trial court improperly sentenced defendant to the extended-term sentence of 10 years' imprisonment, erroneously ordered the sentence to run consecutive to a federal sentence, and refused to give defendant credit for the amount of time he spent in custody.

■ We agree with the State that Byrd waived these sentencing issues by failing to object at the sentencing hearing and failing to raise these issues in a post-sentencing motion. An amendment to section 5—8—1(c) of the Unified Code of Corrections requires:

> "A defendant's challenge to the correctness of a sentence or to any aspect of the sentencing hearing shall be made by a written motion filed within 30 days following the imposition of sentence." 730 ILCS 5/5—8—1(c) (West 1994) (eff. August 11, 1993).

However, even if Byrd had not waived these arguments, we would find his arguments meritless.

First, relative to the trial court's judgment to impose the maximum extended-term sentence, we agree with defendant's concession that the question of what sentence to be fashioned in a criminal case is a matter to be settled by the trial judge. The imposition of a sentence is a matter of judicial discretion and, absent an abuse of this discretion, the sentence of the trial court may not be altered upon review. *People v. Perruquet*, 68 Ill. 2d 149, 153, 368 N.E.2d 882 (1977). Defendant argues that the maximum of 10 years is not warranted because he peacefully submitted to the arrest and never posed a danger to any of the officers.

Furthermore, defendant argues that nothing happened to the of-

ficers following his arrest thus showing that their fear of him and his alleged gang was exaggerated and unwarranted. Defendant fails to recognize that the essence of the crime of intimidation lies in the exercise of improper influence. *People v. Tennin*, 162 Ill. App. 3d 520, 525, 515 N.E.2d 1056 (1987). Defendant was charged with the offense of intimidation for threats he made to the officers during his arrest. Therefore, the defendant's lack of action against the officers following his arrest is irrelevant to the threats at issue in these charges. Accordingly, we find that the trial court did not abuse its discretion in sentencing defendant to the maximum of 10 years' imprisonment.

■ Defendant next contends that his sentence should not have run consecutive to his federal court conviction for conspiracy to commit arson because he was not serving any unexpired federal sentence at the time of the sentence in this case. Defendant maintains that federal authorities did place a "parole hold" on him at the time he was taken into custody in the case *sub judice*; however, as of the date of sentencing, there had been no federal action on the parole case. Therefore, defendant argues, the trial court did not have the authority under section 5—8—4(a) of the Unified Code of Corrections (730 ILCS 5/5—8—4(a) (West 1994)) to impose a consecutive sentence. We also disagree with this contention.

A court may order a sentence to run consecutive to any prior convictions, even where sentencing on those convictions has not yet occurred but is anticipated in an upcoming parole revocation proceeding. Where the case number (*i.e.*, proper identification) of the parole revocation proceeding is in the record, sentences ordered to run consecutively to sentences for parole revocations have been upheld as sufficiently complete, even where those sentences are merely anticipated and have not yet been imposed. *People v. Simmons*, 256 Ill. App. 3d 651, 654, 628 N.E.2d 759 (1993).

In 1983, defendant was convicted in federal court of the offense of conspiracy to commit arson and was given a 12-year prison term. He was paroled from the Federal Bureau of Prisons in 1989. At the time of sentencing in the instant case, defendant was incarcerated for violating his parole on the conspiracy charge. At the sentencing hearing, the trial judge stated:

> "Okay. All right. The Court exercises its discretion in applying the extended term here. I am going to sentence the Defendant to the maximum term permissible by law, 10 years in the Illinois Department of Corrections. No credit. Do you have the case number on the Federal conviction? I will put it here on the record for the consecutive sentencing."

The State then gave the court the case number for defendant's

federal court conviction. Although no action had yet been taken on defendant's parole violation, the trial court sufficiently identified the case number his sentence was to run consecutive to, as is required. It was of no consequence that sentence had yet to be imposed. Accordingly, any vacation of any portion of defendant's sentence would be improper.

■ Defendant's final contention relative to sentencing is that the trial court was wrong for refusing to grant him any credit for time spent in custody awaiting trial on these charges. In his appeal, however, defendant fails to specifically delineate the period of time allegedly spent in custody on the charges. It is defendant's burden to preserve and present a sufficient record of the asserted error. *People v. Smith*, 106 Ill. 2d 327, 478 N.E.2d 357 (1985). Defendant has not provided this court with a sufficient record by which this court can review this issue. Therefore, we decline to examine this issue since it is not properly presented for review.

For the reasons cited herein, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

MCNULTY, P.J., and HOURIHANE, J., concur.