**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 200137

Order filed June 28, 2022

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Henry County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| | ) ) | Appeal No. 3-20-0137 |
| v. | ) ) | Circuit No. 19-CF-379, 19-DT-100, 19-TR-4817, 19-TR-4818 |
| | ) ) | |
| | ) | Honorable |
| LONNY K. FARMER, | ) ) | Terence M. Patton, Judge, Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE McDADE delivered the judgment of the court.
Justice HOLDRIDGE and LYTTON concurred in the judgment.

**ORDER**

¶ 1     *Held*:  (1) The State's evidence was sufficient to sustain defendant's convictions for aggravated driving under the influence of alcohol (DUI), felony driving while license revoked, operating an uninsured motor vehicle, and intimidation. (2) The trial court did not abuse its discretion in imposing a 10-year prison sentence for aggravated (DUI).

¶ 2        After a jury trial, Lonny K. Farmer was convicted of aggravated driving under the influence of alcohol (DUI), in violation of 625 ILCS 5/11-501 (2019); felony driving while license revoked, in violation of 625 ILCS 5/6-303 (2019); operation of uninsured motor vehicle, in violation of 625 ILCS 5/3-707 (2019); and intimidation, in violation 720 ILCS 5/12-6 (2019). The trial court sentenced Farmer to 10 years for aggravated DUI, running concurrently with sentences of 3 years for driving while license revoked and 4 years for intimidation. Farmer now appeals, arguing that (1) the State's evidence was insufficient to sustain any of his convictions and (2) the trial court abused its discretion in imposing a 10-year sentence for aggravated DUI. We affirm.

¶ 3                                          FACTS

¶ 4        Lonny Farmer was arrested outside his residence on September 6, 2019, after police officers responded to a dispatch reporting a person operating a vehicle on a revoked license. He was ultimately charged with that offense as well as aggravated DUI, illegal transportation of alcohol, driving an uninsured vehicle, and intimidation. Charges proceeded to a trial.

¶ 5                          *The Trial Testimony and Evidence*

¶ 6        At trial, Cleverette Conley testified that he was a 46-year-old medical laboratory scientist who did construction on the side. He knew Farmer because Farmer had worked for him and also lived around the corner. Conley identified Farmer for the court. On September 6, 2019, Conley was doing work on a house on Terry Avenue and Farmer was next door drinking with someone who lived there. Conley could hear Farmer talking about him, but he just ignored it. Conley stayed at the Terry Avenue property for two to three hours, waiting for Farmer to leave so he could be sure Farmer would not let his dog "go to the bathroom on my property, because that's what I was told was happening. So, I stayed long enough till he left."

2

¶ 7         Later that evening, Conley left the house to drop his tools at his shop and was standing in his garage's doorway when Farmer's dog ran up to him. Conley testified that Farmer was yelling at the dog, saying things like, "I'll leave you here with the f***ing n*****s." Conley went to the doorway to tell Farmer that his dog had run to him and said: "you say that again." At that point Farmer lifted up his shirt, showed him a gun, and said he just wanted to get his dog. Conley let Farmer get his dog, locked the garage, then went to his house around the corner. Conley arrived at his residence on East Sixth Street around 6:00 p.m. and saw Farmer approaching. He told Farmer to get off his property and Farmer replied that he just wanted to get his dog. Conley did not know Farmer's dog had gotten lose again. He told Farmer to get his dog and get off his property. After Farmer retrieved his dog, he went around the corner, across the street from Conley, and "yelled some racist stuff." Conley got in his truck and drove around the corner to cut Farmer off. Farmer asked if he could just get his dog home, so Conley "just left it alone." Conley explained that Conley's neighbor, with whom he goes to church, came over and asked him to go home, which Conley did.

¶ 8         Conley explained that Farmer threatened to shoot him in his garage "regarding the dog coming on" to his property, saying "I'll shoot you." Conley testified that Farmer usually "wasn't this type of person that he was being that night" and would not be the type to use the N-word. He believed that Farmer was drunk because he saw Farmer drinking all day, knew how much Farmer could drink, and because Farmer "gets that way when he's drunk." Conley also noticed that Farmer "couldn't even get his dog" and believed the dog was "scared" of Farmer. Conley testified that he believed Farmer was under the influence of alcohol that evening.

¶ 9         Zachary Dunn testified that early on the evening of September 6, 2019, he was driving on 6th Street in Kewanee when he saw Farmer "driving." Dunn stopped and talked to Farmer

because he knew him "from the shop." Dunn thought Farmer seemed very "irate" and Farmer told Dunn that he was "going to shoot that n****r." Dunn told Farmer he didn't think that was a good idea and asked: "what's going to happen if the cops stop you?" Farmer was very upset and "not in the right state of mind." Farmer responded that he "was done with [his] life" because his wife had left him. Dunn contacted the police, sharing his observation and concerns regarding Farmer's behavior. Dunn explained that Farmer was visibly upset, but Farmer's threat to shoot Conley prompted him to contact the police.

¶ 10        Officer William Rivord of the Kewanee Police department testified that he responded to a dispatch that a person without a driver's license was driving a black Camaro. Rivord was not given an exact location, and he was driving around the area when a second dispatch came in with a location and informed him that the person had a gun. Rivord traveled to the location and found a black Camaro in front of 612 North Elm Street and identified Farmer as the individual in the driver's seat. Officers Alexander Paulsen and Rosa Rushing arrived on the scene to assist Rivord. Their body cams recorded their interactions with Farmer and his arrest from three angles.

¶ 11        Rivord approached and noticed an excited dog in the passenger seat. He asked Farmer to get out of the car, which he eventually did. Farmer did not have a valid driver's license. He became increasingly agitated as the officers questioned him and asked him to control his dog. Rivord testified that Farmer "was being belligerent to the other officers that were there" so Rivord handcuffed and placed him in the back of the squad car. Farmer told the officers he had a gun in the Camaro. Officer Rushing conducted a search and found "a black, full-frame pistol, that is very reminiscent of like a Smith and Wesson pistol," but that shot BBs.

¶ 12        Officer Paulsen testified that at around 7:15 p.m., he was dispatched to the area of 6th Street and Elm and Walnut because of a "crime stoppers complaint" of a late 90's black Camaro

4

with an unlicensed driver driving up and down the road. When he arrived at 612 N. Elm Street, he observed a black Camaro parked right in front of the residence and saw Farmer in the car. Rivord and Paulsen told the driver to get out of the car and to remove a dog from the vehicle as well. Farmer "did not seem very happy that he was having contact with law enforcement." Paulsen could smell alcohol on his breath and observed that he had slurred speech and appeared to be under the influence. Farmer told them he was having problems with Conley regarding some work and that Conley had threatened to shoot his dog. Paulsen testified that he searched Farmer and found his wallet and keys to the vehicle in his right front pants pocket. He stated that he never saw Farmer drive the car and that the car was not running when he arrived. Body cam footage of the incident was played for the jury showing that the car was parked on a grassy driveway on the front lawn of the house.

¶ 13        Officer Rushing testified that when she arrived at Farmer's home, Rivord and Paulsen were pointing their weapons at Farmer, who was in a car parked in front of his residence. Rivord gave Farmer several commands to step out of the vehicle before Farmer eventually complied. She secured Farmer and placed him near a squad car. He had slurred speech and bloodshot eyes, smelled of alcohol, and became very belligerent so was placed in handcuffs. Farmer consented to being searched but was not carrying have a weapon. When they searched the car, Rushing located a BB gun underneath the passenger seat. She also saw a 15-pack of Keystone Light beer and one open beer can in the car. Farmer refused to submit to a field sobriety test but she believed he was impaired. Rushing transported Farmer to the Kewanee Police Department where she read him the Illinois motorist warning. The State introduced footage from Farmer's booking at trial, showing Farmer saying he did not have insurance. Rushing testified that Farmer then

refused take a breathalyzer. She said that the odor of alcohol coming from his breath increased when he was in the booking room.

¶ 14        The jury found Farmer guilty of all charges except the illegal transportation of alcohol count. The case then proceeded to sentencing

¶ 15                    *The Presentence Report and Sentencing Hearing*

¶ 16        A pre-sentencing investigation report (PSI) was filed with the trial court. The PSI indicated that Farmer was 46 years old and had been consistently employed for the 25 years leading up to his arrest. The PSI also showed that Farmer had a substantial criminal history of drunk driving combined with assault charges and convictions. His numerous traffic violations and repeated restrictions violations spanned most of his adult life.

¶ 17        Farmer's most recent Illinois traffic violation was in 2011 when he was sentenced to 180 days in jail for aggravated DUI and driving on a revoked license. Thereafter, he had multiple traffic convictions in Idaho (in 2012), in Utah (in 2012 and 2015), and finally in Colorado. His Colorado conviction was in 2017 where he was ordered to complete 36 months' probation, out-patient therapy, 365 days in jail, and to pay a fine for DUI. A petition to revoke his probation was filed later that year alleging Farmer failed to enroll in treatment, failed to comply with testing, failed to report to probation, and that his whereabouts were unknown. The warrant remained active.

¶ 18        Farmer offered a personal statement to the court. He explained that in November of 2018, he relocated to Illinois from Utah, where he had worked for oil and natural gas companies on drilling rigs for 24 years. He returned to Illinois because he no longer wanted to be away from his fiancé, who was pregnant at the time. However, she lost the baby about six weeks before his arrest, which had been devastating to the two of them. His fiancé then abruptly left, leaving her

car and belongings behind, and no one, including their friends and family, had any idea where she went. Farmer explained that he was in a very poor mental and emotional state at the time of his arrest and apologized for his behavior toward the officers.

¶ 19    At the sentencing hearing, the defense argued in mitigation that "the crux of the DUI was Mr. Farmer sitting in a car outside of his house." The defense asked the court to consider Farmer's employment history and his personal statement. The court stated:

> Let the record reflect the Court has considered the nature and circumstances of the offense. The information in the PSI and the attachments of the Farmer's letter that he wrote. Considered the statutory factors in aggravation and mitigation, and any relevant nonstatutory factor. I have considered the rehabilitative potential of Farmer and the cost of incarceration.

¶ 20    The court then discussed the factors in mitigation and did not find any that assisted Farmer because "DUI comes with a risk of harm" so his sitting in his car was not a mitigating factor, and because Farmer had a "terrible criminal history" related to drugs, alcohol, violence, and domestic violence. The court found the following factors in aggravation to be relevant: Farmer's prior record; the sentence being necessary to deter others from the same crime; Farmer "just keeps drinking, using drugs, driving, threatening, assaulting people. It's what he does;" and Farmer's criminal history demonstrated he had "close to zero" rehabilitative potential because his criminal history was "ridiculous." The trial court was astounded that Farmer had not been sentenced to prison time on any of his aggravated DUI convictions, even though he had been previously sentenced to mandatory prison time on other offenses.

¶ 21    The court sentenced Farmer to 10 years' imprisonment in the Illinois Department of Corrections followed by 2 years of mandatory supervised release for aggravated DUI, 3 three years in the Illinois Department of Corrections followed by 1-year of mandatory supervised release for felony driving with license revoked, and 4 years in the Illinois Department of

7

Corrections followed by 1-year mandatory supervised release for intimidation, all sentences to run concurrently. The court imposed the statutory fine of $501 for Farmer's conviction of driving with a revoked license. Farmer filed a motion to reconsider his sentence, which the trial court denied.

¶ 22 Farmer appeals.

¶ 23          ANALYSIS

¶ 24 On appeal, Farmer challenges the sufficiency of the State's evidence to sustain his convictions. He also challenges his 10-year sentence for aggravated DUI as excessive.

¶ 25       A. Sufficiency of the State's Evidence

¶ 26 On appeal, Farmer argues that the State's evidence was insufficient to support his vehicular convictions. In reviewing a challenge to the sufficiency of the evidence, the relevant question is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *People v. Wiggen*, 2021 IL App (3d) 180486, ¶ 16. A conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *Id.* Farmer raises several contentions that apply jointly and separately to his vehicular convictions. Additionally, he argues that the State failed to prove that he had the specific intent necessary to sustain a conviction for intimidation. For the reasons that follow, we affirm his convictions.

¶ 27     1. Farmer was in physical control of a vehicle.

¶ 28 Farmer first argues that the State failed to prove beyond a reasonable doubt that he was in actual physical control of his vehicle. He asserts that the legislative intent in predicating aggravated DUI offenses on actual physical control was to encourage drunk drivers to secure

8

alternative transportation. He contends that because his "car was on his own property, *** the State did not prove he had the intent to do anything other than remain there." Accordingly, he argues that the State failed to prove him guilty of aggravated DUI and, for the same reason, felony driving while license revoked. We disagree.

¶ 29 Under section 11–501(a)(2) of the Illinois Vehicle Code (Code) (625 ILCS 5/11–501(a)(2) (West 2019)), "[a] person shall not drive or be in actual physical control of any vehicle" while under the influence of alcohol. Accordingly, the prosecution was required to establish that Morris was "in actual physical control" of the car and intoxicated. *People v. Morris*, 2014 IL App (1st) 130512, ¶ 17. "A person need not drive to be in actual physical control of a vehicle, nor is the person's intent to put the car in motion relevant to the determination of actual physical control." *Id.* (quoting *City of Naperville v. Watson*, 175 Ill.2d 399, 402 (1997)). The issue of actual physical control is determined on a case-by-case basis, considering whether the defendant: (1) possessed the ignition key; (2) had the physical capability to operate the vehicle; (3) was sitting in the driver's seat; and (4) was alone with the doors locked. *Id.* These factors provide a guideline to determine whether the defendant had actual physical control of the vehicle; the list is not exhaustive, nor is the absence of one individual factor controlling. *Id.*

¶ 30 The evidence presented at trial showed that Farmer was in actual physical control of a vehicle when the officers arrested him. First, he was discovered sitting in the driver's seat of the vehicle. Although the doors were not locked, Farmer was the only person in the car and capable of exerting physical control over it. While searching him, the officers located the ignition key in his front pocket. Farmer contends that the State offered no evidence that the key found was the "actual" ignition key. However, such direct evidence is not necessary to establish that he had the

9

capability to operate the vehicle. Officer Rivord testified that he received a dispatch reporting a person believed not to have a license was driving a black Camaro on 6th Street. Rivord was traveling eastbound on 6th Street when he saw a black Camaro, matching the description he had been given, parked in front of Farmer's residence. Finally, Dunn partially corroborated the dispatch, testifying that he had seen Farmer driving earlier that evening.

¶ 31                           2. Farmer was under the influence of alcohol.

¶ 32        Farmer also argues that the State's evidence is insufficient to sustain his conviction for aggravated DUI because it fails to establish beyond a reasonable doubt that he was under the influence of alcohol. "A person is under the influence of alcohol when, as a result of drinking any amount of alcohol, his mental or physical faculties are so impaired as to reduce his ability to think and act with ordinary care." *Morris*, 2014 IL App (1st) 130512, ¶ 20 (quoting Illinois Pattern Jury Instructions, Criminal, No. 23.29 (4th ed.2000)). Farmer contends that even if there was some evidence that he consumed alcohol, "there was insufficient evidence of impairment." Again, we disagree.

¶ 33        To establish that Farmer was guilty of driving under the influence, the prosecution must show that he was affected by his use of a drug or alcohol to a degree that rendered him incapable of driving safely. *Id.* Circumstantial evidence alone may suffice to prove a defendant guilty of DUI. *Id.* Where the arresting officer provides credible testimony, scientific proof of intoxication is unnecessary. *Id.* Testimony that a defendant's breath smelled of alcohol and his or her eyes were glassy and bloodshot is relevant and admissible evidence in a DUI prosecution. *Id.* Moreover, a defendant's refusal to submit to chemical testing suggests a consciousness of guilt. *Id.*

10

¶ 34 There was ample testimony from the arresting officers about Farmer's physical condition. The officers reported that Farmer had a strong smell of alcohol on his person and his breath. On the body cam recording, Officer Rushing told Farmer that he had bloodshot eyes and a strong smell of alcohol. She asked Farmer if he was willing to submit to a field sobriety test and he refused to do so. Moreover, other eyewitnesses testified that Farmer was intoxicated. Conley observed Farmer drinking all day and knew from prior observation how much Farmer could drink. He believed Farmer was under the influence of alcohol that evening. Conley also opined that, regardless of any resentment Farmer may have been feeling against him at the time, Farmer would not have said the "racist stuff" he had been saying unless he was intoxicated.

¶ 35                          3. Farmer was operating a vehicle on a public "highway."

¶ 36 Farmer next argues that the State's evidence is insufficient to sustain his conviction for felony driving while his license was revoked. Section 6–303(a) of the Illinois Vehicle Code (Code) criminalizes, in pertinent part, driving or being in actual physical control "of a motor vehicle on any highway of this State at a time when such person's driver's license * * * is * * * revoked or suspended." 625 ILCS 5/6–303(a) (West 2019). Farmer does not dispute that his driver's license was revoked when he was apprehended. Instead, he argues that the State failed to prove that he was in physical control of the vehicle and that it was "on [a] highway of this State." As previously discussed, we find that he was in physical control of a vehicle. *Supra* ¶ 30. He, however, contends that because the officers apprehended him when his car was parked off the road and in front of his residence, he was not on a "highway as required by the statute."

¶ 37 For purposes of the Code, "highway" means "[t]he entire width between the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel." 625 ILCS 5/1–126 (West 2019). When Farmer was apprehended,

11

his car was not on a public highway. However, when viewed in the light most favorable to the State, the evidence shows that he had been seen and reported driving his car immediately before he was apprehended.

¶ 38        Rivord testified that he responded to a dispatch of a black Camaro being driven by a person without a driver's license. At first, Rivord was not given an exact location, but as he was driving around the area, a second dispatch came in with a location and information that the person had a gun. Rivord traveled to the location and found a black Camaro in front of 612 North Elm Street and identified Farmer as the individual in the driver's seat. Similarly, Paulsen testified that at around 7:15 p.m., he was dispatched to the area of 6th Street and Elm for a "crime stoppers complaint" of a late 90's black Camaro with an unlicensed driver driving up and down the road. When he arrived at 612 N. Elm Street, he observed a black Camaro parked right in front of the residence and Farmer was in the car. Dunn corroborated the dispatch, testifying that he had seen Farmer driving on 6th Street earlier that evening. We conclude that, when taken in the light most favorable to the State, the evidence supports a reasonable inference that Farmer was operating his vehicle on a public highway—namely 6th Street in Kewanee, IL.

¶ 39                4. Farmer had the required intent for the offense of intimidation

¶ 40        Finally, Farmer argues that the State's evidence was insufficient to sustain his conviction for intimidation. "A person commits intimidation when, with intent to cause another to perform or to omit the performance of any act, he or she communicates to another, directly or indirectly by any means, a threat to *** inflict physical harm" on the other. 720 ILCS 5/12-6 (a)(1). Intimidation is a specific intent crime. *People v. Byrd*, 285 Ill. App. 3d 641, 647 (1996). The intent at issue is that to cause someone to act or not act, rather than the intent to carry out the

threat. *Id.* at 648. Intent may be deduced by the trier of fact from the facts and circumstances surrounding the offense. *Id.* at 647

¶ 41      Farmer contends that the "State failed to establish that [his] threat to Conley was made with the intent to make Conley perform or omit to perform an act." The State contends that Farmer threatened Conley in order to get him to relinquish Farmer's dog. Farmer asserts that he obtained his dog before any threat was made and thus could not have intended the alleged relinquishment. That assertion is contradicted by Conley's testimony that he told Farmer to take his dog after Farmer exposed the gun and said he just wanted his dog. This evidence, viewed in the light most favorable to the State, supports the jury's guilty verdict.

¶ 42      We find that the evidence also supports a second, related, intent in Farmer's exposure of the gun:  forestalling Conley from an escalating confrontation about Farmer's racist statements. Conley testified that while Farmer was yelling at the dog, he heard him say: "I'll leave you here with the f***ing n*****s." Hearing that, Conley went to the doorway to confront Farmer. when he told Farmer to "say that again," Farmer then lifted his shirt, showing Conley the gun and saying he just wanted to get his dog. We find it reasonable to infer that Farmer intended to stop Conley from acting in response to his own racist statements and exposed the gun to further that intent.

¶ 43                    B. The Excessiveness of Farmer's Sentence

¶ 44      On appeal, Farmer argues that the trial court abused its discretion by sentencing him to 10 years for Aggravated DUI. Because the circuit court has the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age, deference is afforded its sentencing judgment. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). "A sentence which falls within the statutory range is not an abuse of discretion

13

unless it is manifestly disproportionate to the nature of the offense." *People v. Jackson*, 375 Ill.App.3d 796, 800 (2007). Because Farmer had 5 prior DUIs, he was sentenced as a Class 1 offender for aggravated DUI, which has a sentencing range of 4-15 years. 625 ILCS 5/11-501(a)(2), (d)(1)(A), (d)(2)(D) (West 2019); 730 ILCS 5/5-4.5-30(a) (West 2019).

¶ 45       Farmer asserts that the court "did not find that any mitigation factors [were] present." He contends that the court therefore disregarded the mitigation evidence presented at the sentencing hearing. He argues that the factors considered in aggravation do not support the trial court's finding that he lacked any rehabilitative potential.

¶ 46       The existence of mitigating factors does not obligate the sentencing judge to reduce the sentence from the maximum or to impose a minimum sentence. *People v. Madura*, 257 Ill.App.3d 735, 740-41 (1994). It is the task of the trial judge to strike the proper balance between rehabilitative potential and the seriousness of the offense. *People v. Clark*, 207 Ill.App.3d 439, 457-58 (1991). The trial judge need not give greater weight to any potential for rehabilitation than to the seriousness of the offense. *People v. Smith*, 321 Ill. App. 3d 523, 537 (2001).

¶ 47       At sentencing, the trial court considered that Farmer "just keeps drinking, using drugs, driving, threatening, assaulting people," concluding that "his rehabilitative potential is as close to zero as I've seen." The PSI supports this consideration. It showed that Farmer that had a substantial criminal history of drunk driving combined with assault charges and conviction. Although Farmer's convictions for DUI and related criminal offenses have been frequent and repetitive and have occasionally required short stints in jail, his conduct has continued undeterred and unabated. In fact, Farmer's most recent violation was from Colorado in 2017 where he was ordered to serve 36 months' probation and 365 days in jail, undertake out-patient therapy, and

14

pay a fine for DUI. When he violated those terms, a petition was filed to revoke his probation and an arrest warrant was issued. It was learned at that time that he could no longer be found and the warrant remains outstanding. In these circumstances, we cannot say that a sentence which might otherwise seem unwarranted by the particular offense is an abuse of the trial court's discretion.

¶ 48                                    CONCLUSION

¶ 49         The judgment of the circuit court of Henry County is affirmed.

¶ 50         Affirmed.